### THE BAYONNE.

(District Court, E. D. New York. July 9, 1901.)

COLLISION—SCHOONER AND TUG—VIOLATION OF RULES.

A schooner was coming down North river, crossing on the port tack, with a strong ebb tide, while a tug with a car float on her port side was going up about 600 feet from the New Jersey shore. When in front of the tug, and 600 feet distant, the schooner went about, in violation of the rules; there being ample room for her to continue on the port tack until she had crossed the course of the tug. Before she acquired headway after coming about she was carried down by the tide and came in collision with the float. The tug reversed with all speed when the schooner went about, but it appeared that the bow of the float swung somewhat to starboard. *Held*, that the only fault possibly attributable to the tug was in failing to starboard her wheel, which was not culpable, since she acted in extremis after having been placed in a perilous position through the sole fault of the schooner, and that she could not be charged with liability for any part of the damage to the schooner.

Peter S. Carter, for libelant.
James J. Macklin, for claimant.

THOMAS, District Judge. On the 4th of January, 1900, at 2 p. m., the schooner Beatrice L. Corkum, whose length is about 80 feet on the water line, carrying coal, was on the port tack crossing the North river, with a moderate wind from the west southwest, and with a strong ebb tide, and clear weather. The steam tug Bayonne, with a car float on her port side, was coming up the river, about 600 yards from the New Jersey shore. When in a position hereinafter to be ascertained, the schooner went about with the intention of going on the starboard tack, and shortly her starboard side just aft her fore rigging came in collision with the starboard corner of the car float, whereby the schooner received the injuries which are the subject of the libel. When the schooner went about she was about 600 feet in front of the car float. The schooner had sufficient opportunity to continue her port tack, and her change of course was in disobedience of the rule, and primarily relieves the Bayonne from liability for the accident. Burt v. The Nevada (D. C.) 3 Fed. 928. Therefore the primary question is, why did the schooner change her course? Concerning this the captain of the schooner, who was at the wheel, gave the following evidence:

"Q. Who gave the order for the schooner to go about? A. Myself and the pilot. I said to the pilot, 'We had better go about,' and he said, 'Yes; we had better tack ship.' Q. Why did you say that to the pilot? A. I don't know. I hardly know myself why I said it. I thought probably if we went inside of him we might go into the piers, or whatever you call them, and that maybe there wouldn't be water enough for us. I didn't know the depth of the water. I was unacquainted."

The schooner had a pilot in charge, who testified that at the time the schooner backed the car float was 200 yards away, and about an equal distance from the shore; that, if the schooner had kept on her port tack, he would have cleared the bow of the car float and tacked inshore of it, without difficulty. "Q. Do you know who it was suggested that the vessel should go on the starboard tack before the collision? A. Yes; the captain of the tugboat. He blew an alarm whistle for us to go on starboard tack. That is why we went." He further testified that but for the alarm whistle he expected to tack inshore of the car float, and that the captain of the vessel had not spoken to him about going about. Here is a direct collision between the captain and the pilot. The pilot has attempted an excuse for change of course, and that excuse tends to involve the tug. It is undoubted that an alarm whistle was blown, but the important question is whether it caused the schooner to change her course. There is no suggestion whatever in the libel that the schooner changed her course on account of such alarm whistle, nor is it charged as fault against the tug. Nor is there the slightest suggestion of it in the evidence of the captain, or in the direct evidence of the pilot, but it only appears upon the cross-examination of the latter. Under such circumstances, the court is not justified in concluding that the alarm whistle impelled the change of course, misled the navigators of the schooner, or disturbed their judgment in any manner whatever. But it is contended on the part of the schooner that after she went about the tug should have immediately stopped and reversed her engines, and should have star-

boarded her wheel so that the float could not have swung the bow of the steam tug and float to starboard across the changed course of the schooner. It is also urged as fault against the steam tug that she did not keep "on her course and closer to the Jersey shore, when the persons in charge of the said steam tug should have known that, when the said schooner would go about, the strong ebb tide would naturally carry the schooner down, until she got sufficient headway on so as to have sailed clear and away from the said steam tug and float which the steam tug had in charge." It is alleged, therefore, by the libelant that the tug was in fault for not keeping her course, and was also at fault because she did not immediately stop and reverse under a starboard wheel. With a schooner going about in front of her, it was entirely proper for her to stop and reverse, and she should not be criticised for so doing. The schooner had disobeyed the rule, and the vessels were in such peril of collision, through the fault of the schooner, that the burden is upon her to show in extremis even the tug was at fault. The captain of the schooner states: "I attribute the collision to the steam tug. It could have been avoided by the tugboat keeping on her course." The evidence on the part of the tug tends to show that the alarm whistle was blown to call the attention of the persons on the schooner, and that the tug, which was going about three knots an hour, was slowed and stopped, while the schooner was yet on her port tack, and that the schooner did not go about until she had passed the bow of the float, but that she did not fill right away; that the tide brought her down upon the float; and that, in backing and reversing under a signal for full speed, the bow of the float was carried to starboard. It is apparent that, when the schooner went about, the engines of the tug were reversed, and that she was backed with all haste, and that the schooner did not fill sufficiently before the time of the actual contact to allow a clearing of the vessels, the starboard corner of the float striking a glancing and dragging blow along the starboard side of the schooner, and that the alarm whistle was given as a warning, and with no intention of suggesting that the schooner should go about. It does not appear what was done with the wheel at this time, although the captain of the tug states that he could not have done anything more than he did to have avoided the collision. The fact has not been overlooked that it is claimed on the part of the schooner that she went about before entering on the course of the tug and the float, and, according to the evidence of the captain of the schooner, not only was the schooner well off from the tug and float, but the latter went to starboard 500 feet, and thereby brought about the collision. This is so extravagant that it must be at once rejected. If starboarding would have tended to throw the car float to port, and it was not done, nevertheless it was an omission in an emergency caused by the reckless act of the schooner, which should not be held to be culpable negligence under the circumstances presented. The only fault possibly attributable to the float which contributed to the accident was the failure, if it was not done, to starboard the wheel. But, as has been already stated, that fault is not regarded as culpable, considering the extremity in which the schooner had placed the tug.