EARL W. NETHERTON, APPELLANT, v. THE FARMERS EXCHANGE BANK, IN LIQUIDATION, RESPONDENT.—63 S. W. (2d) 156.

Kansas City Court of Appeals. November 17, 1933.

*Dean H. Leopard* for appellant.

*Ed C. Hyde, Earle W. Frost, J. W. Alexander* and *L. B. Gillihan* for respondent.

SHAIN, P. J.—This is an action by E. W. Netherton, plaintiff, asking to have an adjudicated claim against the Farmers Exchange Bank of Gallatin, Missouri, declared to be a preferred claim.

On March 4, 1926, the aforesaid bank was closed and placed in the hands of Commissioner of Finance for liquidation. At the time of the commencement of this action, S. L. Cantley was the Commissioner of Finance and Joseph M. Martin was Special Deputy in charge of the bank.

The evidence discloses that on November 1, 1924, the plaintiff was indebted to the bank in the sum total of $3,335. This indebtedness was evidenced by three notes, one for $1,335 and two notes of $1,000 each. The evidence discloses that the bank sold one of the notes to J. H. Weldon, now deceased, and the other $1,000 was sold to A. M. Dockery, now deceased. At the time of the commencement of this action, both the Weldon and Dockery estates were in course of being administered. As to the Weldon and Dockery notes, it appears that same were kept in private boxes at the bank and that access was had to same by the bank officials who attended to collection of interest and renewals of the notes.

The plaintiff was not at the time a resident of Gallatin and the plaintiff's father, C. O. Netherton a resident, appears to have looked after his son's business affairs in connection with dealings with the bank and had signed with his son on the notes. It appears that at regular intervals renewals were made as to these notes and payments of interest and on principle were made so that at the time the bank was taken over plaintiff's actual indebtedness consisted of one note of $1,160, one note (Dockery) for $1,000 and one note (Weldon) for $1,000. However, it appears from the evidence that an official of the bank had taken the Weldon note out of the Weldon estate papers and had charged off bad notes to a like amount and entered the $1,000 Weldon note as a bank asset and it further appears that the $1,160 note and this $1,000 Weldon note had been sold to the Fidelity National Bank & Trust Company of Kansas City, Missouri. The evidence discloses that through fraudulent misrepresentation of a bank official under pretense of renewal, wherein original note was delivered, the father of plaintiff was induced to execute for his son an extra note for $1,040, presumably as a renewal of the Weldon $1,000 note and interest. This $1,040 note to which C. O. Netherton had signed his son's name and to which he added his name as security never went into the bank and at the time the bank was taken over by the Commissioner this $1,040 was found in the Weldon estate papers where it had evidently been placed by an official of the bank to take the place of the $1,000 note that had been wrongfully taken therefrom.

It appears from the evidence that the plaintiff, through his father, was called upon to pay and did pay all of the outstanding notes which included the $1,040 note aforesaid. It follows, of course, that the plaintiff has paid out $1,040 more than his actual indebtedness.

The trial court allowed plaintiff's claim for $1,040 but refused to give the same preference. From the judgment allowing preference the plaintiff appealed.

### OPINION.

This cause is before the court on rehearing. There is no room to doubt but what the assets of the defunct bank were wrongfully swelled by the transaction disclosed by the evidence in the full sum of $1,040. The case was originally presented upon the theory that the transaction directly created a trust *ex-maleficio* in favor of the plaintiff. The fact that the entire proceeds of the note are shown and admitted to have gone into the Weldon estate is repugnant to the application of the claim that an *ex-maleficio* trust was directly created in favor of plaintiff herein.

When the Weldon note was wrongfully taken into the bank, there was created an *ex-maleficio* trust in favor of the Weldon estate. It therefore follows that for a preference to be declared in favor of the plaintiff it must first be adjudicated that the benefits of that trust enures to plaintiff.

Upon this rehearing, a claim for preference is made based upon equitable principles of subrogation.

In view of the powers conferred on circuit courts by Section 22, Article 6 of the Constitution of Missouri and in view of the provisions of Chapter 34, Revised Statutes 1929, and further in consideration of the declaration of the Supreme Court in State v. Page Bank of St. Louis County, reported in 14 S. W. (2d), at page 597, wherein it is held the power in the circuit court in such matters "included priorities of an equitable nature," we conclude that the principle of equitable subrogation is germane to the issue herein and that this court should give consideration to the issue from that standpoint.

It appears that the plaintiff in this case does not plead subrogation. However, if the facts are present the failure to plead same should not bar the right in that it is the duty of the court to give consideration of priorities of an equitable nature.

It has been held: "Although the right of subrogation should ordinarily be plead, yet, in the absence of a plea equity may grant relief under a prayer for general relief if it is justified by the facts alleged and established. [Western Surety Co. v. Walter, 44 S. W. 112, 182 N. W. 6235, 24 A. L. R. 1519.]

The fact that the plaintiff had an apparent meritorious defense to an action on the $1040 note raises the question as to whether or

not he was a mere volunteer in making the payment. If the plaintiff was but a mere volunteer, then no right of subrogation exists.

The doctrine of subrogation was borrowed by equity from the civil law. However, as equity has grown so has the doctrine of subrogation grown and while the right was formerly limited to transaction between principals and sureties it has greatly expanded. Under the doctrine as it stands, it is broad enough to include every instance in which one person pays the debt of another for which the other is primarily liable and should in good conscience have been paid by the other, provided, of course, that there are circumstances present which take the transaction out of the sphere of a purely volunteer payment. [Gersta Corp. v. Equitable Trust Co., 241 N. Y. 418, 150 N. E. 501; United States Fidelity, etc., v. Branwell, 108 Ore. 261, 217 Pac. 332.]

There can be no doubt but what the Weldon estate would have been entitled to a preferred claim for the amount of the note and interest that was purloined from its papers. The plaintiff, through fraud and manipulation on the part of the bank, was deceived into executing the $1040 note that went to reimburse the Welden estate for the note wrongfully taken from the estate by the bank. We conclude, that the plaintiff in paying the $1040 should not be concluded to be a mere volunteer.

In Pomeroy Equity Jurisprudence (4 Ed.), Section 1212, the text is to the effect that one who pays at the instance of the debtor is not a volunteer.

The Farmers and Merchants Exchange Bank of Gallatin was unquestionably debtor to the Welden estate in the full sum of $1040. Plaintiff through fraud upon the part of the bank and at the bank's request paid the bank's debt to the Welden estate. One paying under such circumstances cannot be held to be a mere volunteer. [State Saving Trust Co. v. Spencer et al., 201 S. W. 967.]

In 37 Cyc. 374, a volunteer is classed as one who pays without either legal or moral obligation to pay.

It is presented by the respondent in this case that plaintiff did not pay, that his father paid and that showing is not made that the son has paid the father. As the judgment of the lower court is to the effect, that by reason of this transaction the bank is indebted to the plaintiff in the sum of $1040 and as no appeal has been taken from that judgment the respondent is in no position to urge such a point. It follows, that we are only concerned herein as to the status of the claim. A person placed in the position of the plaintiff cannot be held to the knowledge of all defenses, in law or equity he might impose in defense of payment. There was present a colorable obligation. It is manifest from the record that the plaintiff, under an honest belief that he was bound, paid. Under such circumstances, we conclude that

the plaintiff is entitled to be subrogated. [Jacobs v. Webster, 199 Mo. App. 604, 205 S. W. 530.]

The circuit court having given judgment for the debt, from which no appeal has been taken, therefore, for reasons above given judgment of the court in refusing preference is reversed and cause remanded with instruction for the trial court to enter judgment in favor of plaintiff for preferred claim in the amount the evidence discloses the assets of the bank were swelled by the wrongful act of the official of the bank in wrongfully listing the purloined Weldon note as an asset of the bank. All concur, *Trimble, J.,* in a separate opinion.

### SEPARATE CONCURRING OPINION.

TRIMBLE, J.—Plaintiff, having a claim against the Farmers Exchange Bank of Gallatin, Missouri, which closed its doors and was placed in the hands of the State Finance Commissioner on March 4, 1926, duly presented such claim to said Commissioner who rejected the claim outright. Whereupon, in due and proper time, plaintiff brought this suit in the circuit court to have his claim established and declared as a preferred one in the sum of $1,111.33 and paid as such.

The trial court, after hearing the evidence, set aside the Commissioner's outright rejection of said claim, adjudged that it was not entitled to a preference but allowed it, in the sum of $1040, as a common claim against the assets of said bank. Whereupon plaintiff appealed.

The claim grows out of what was done with reference to one of two notes for $1000 each and also a third note hereinafter described, it being thought best to defer particular description of the latter at this time for the sake of clarity. It is perhaps somewhat difficult to ascertain from the petition precisely which note it is, upon the acts done with reference to which, plaintiff relies for his asserted preference. After alleging the organization and existence of the bank, its failure and consequent going into the hands of the Commissioner for liquidation, the petition goes on to state the plaintiff, with C. O. Netherton (plaintiff's father), on November 1, 1924, executed and delivered two promissory notes of that date for $1000 each, both of them being payable to the bank and due six months after date; and

"That shortly after such execution and delivery, the bank sold and delivered one of said notes to A. M. Dockery and the other to J. H. Weldon; that each of said purchasers left the respective note so purchased by him in his individual papers with said bank for safe keeping and collection; that such sale and transfer of said notes were made without the knowledge or consent of plaintiff; that afterwards, and without the knowledge or consent of plaintiff, or of said Weldon or said Dockery, and without paying therefor, an official of said bank,

in charge thereof and 'having access to the notes and papers of said J. H. Weldon and said A. M. Dockery, left in said bank for safe keeping as aforesaid, did abstract and take from such private papers and property of the said A. M. Dockery, or J. H. Weldon, *and as said claimant believes* of said J. H. Weldon . . . ' one of the notes aforesaid for the sum of $1000 and then and there placed on said note, at that time, a number, that is number 41254, and . . . placed said note so numbered, and listed the same, among the assets and property of said bank, and in order to make the notes and accounts of said bank balance,' such official took out of the assets of said bank certain *worthless* notes (a list of which is given in the petition with the amount of each, the whole aggregating $1000 and the same were marked as being delivered to a trustee. (Italics mine.)

"That this claimant has good reason to believe and does believe that the note so abstracted was taken from the wallet and the papers of the said J. H. Weldon, and that the said taking was wrongful, and made for the purpose of covering up and hiding notes above mentioned, taken from the assets and notes of said bank, which were all worthless, uncollectible and of no value whatever; that thereafter and on or about the 1st day of May, 1925, the cashier of said bank represented and stated to the plaintiff and C. O. Netherton, his surety on the note aforesaid, that it had sold to J. H. Weldon one of said $1000 (notes) and that same was due and payable, and that said bank held said note for collection and renewal; and that if this claimant and his surety would execute a new note of date of May 1, 1925, for the sum of $1040 payable to J. H. Weldon, special, six months after date with interest thereon at the rate of eight per cent per annum, that said bank and its officers would procure and deliver to plaintiff said note of $1000, hereinbefore mentioned as sold to J. H. Weldon; that that relying on said promise, claimant C. O. Netherton, his surety as aforesaid, made, executed and delivered to said bank, such note payable to J. H. Weldon, special, for said sum of $1040, but said bank failed and did not deliver to this claimant or his said surety, said note for $1000 hereinbefore mentioned as wrongfully placed in the assets of said bank, but said bank kept and retained such note No. 41254 in its assets, or sold the same to parties unknown to these claimants.

"That said note so sold to A. M. Dockery was never renewed, nor presented to be paid, and claimant had no knowledge or information that said A. M. Dockery held such note until after said bank and its affairs were placed in the hands of such Special Commissioner of Finance on March 4, 1926.

"That therefore to-wit, said note No. 41254 became due and payable, and said bank and its officers and agents in charge thereof falsely and fraudulently represented to claimant that such note was one of the $1000 then unpaid, and claimant believing such false statement

and relying thereon gave a new note in lieu thereof and in payment thereof, payable to said bank, and its officers, for said sum of $1000, which new note was numbered 41760, which note was placed in the assets of said bank on June 6th, as shown by note blotter used by said bank on that date at pages 212 and 213, and said note No. 41254 was taken out of the assets and charged off the assets of said bank and delivered to claimant.

"That afterwards on November 30, 1925, said note numbered 41760 was paid off and discharged by a new note for the sum of $1000, No. 43031 given by claimant to said bank, as shown by note blotter of said date used by said bank, at pages 226 and 227; that thereafterwards, said bank sold and delivered said note No. 43031 to the Fidelity National Bank & Trust Company of Kansas City, Missouri; that the claimant herein was compelled to and did on the 20th of April, 1926, pay said note No. 43031, principal and interest, to said Fidelity National Bank & Trust Company of Kansas City, Missouri; that afterwards, to-wit, on May the 2nd, 1926, the plaintiff herein was compelled to and did pay in full to said A. M. Dockery the amount due on the note so sold to him, the said A. M. Dockery, by said bank, of $1000 and the interest.

"That there was outstanding against this claimant said note for $1040 given to said J. H. Weldon, special, dated May 1, 1925, which the plaintiff was compelled to, and did pay in full, principal and interest, on June 19, 1926, in the amount of the sum of $1,135.43; that on said note numbered 41254 claimant herein has paid interest to said Farmers Exchange Bank, on said note numbered 41254, $40 on March 31, 1925, the sum of $40 on November 1, 1925, and paid the Fidelity National Bank and Trust Company, interest on said note on April 22, 1926, to the amount of $31.33.

"That by reason of the premises and the fraudulent detaining of said note as aforesaid, and the renewals thereof, that this claimant has been defrauded of the sum of $1,111.33 on account of principal and interest paid on said note so fraudulently and wrongfully taken from said Bank from the envelope and papers of said J. H. Weldon; that the assets of said bank have been wrongfully and fraudulently increased by the said note of number 41254 by the sum of $1,111.33 which sum has passed among the other assets of said bank to and is now in the charge and possession of the . . . Commissioner of Finance in charge of said bank.

"That by reason of the fraud aforesaid, by said bank, the sum of $1,111.33 should be impressed with the trust for the use and benefit of this claimant, and this claim and demand against said bank in favor of this claimant should be entitled to priority and preference in payment over and above all general claims or credits against said bank."

Then follows an allegation that claim was duly filed and sixty days have elapsed, etc. Therefore claimant prays a preference in the sum of $1,111.33, etc., and for such further orders, judgments and decrees as may be proper and just in the premises.

The record discloses no answer to said petition save perhaps a general denial. At least the case was tried as if such were filed.

At the May Term, July 11, 1928, the Circuit Court heard the case, and a decree was rendered which recites, among other things, that the court finds:

"That the claim of E. W. Netherton for the sum of ten hundred forty ($1040) dollars on note transactions with the Farmers Exchange Bank and which claim was rejected by the Commissioner of Finance in charge of said bank outright, and his action in so doing is hereby set aside, and after the rejection of said claim by said Commissioner, the said claimant, E. W. Netherton, brought suit to have his claim established as a preference and for preferential payment, and this cause now is submitted to the court upon the evidence, and the evidence heard upon the claim for preference, and the court being fully advised in the matter, finds that said claim *is not entitled to a preference* but is entitled to be approved as a common claim. (Italics mine.)

"It is, therefore, ordered, adjudged and decreed by the court that the claim of E. W. Netherton for the sum of ten hundred forty ($1040) dollars be and the same is hereby denied a preference or for preferential payment and the same be and is hereby allowed as a common claim *only*, against said bank, same to be paid along with all other common claims after the payment of all preferred claims." (Italics mine.)

The evidence in behalf of claimant is long and intricate, owing to the introduction of many renewal notes identified by numbers and it is too long to set it out in full; but it may be recapitulated and summarized as follows:

In November, 1924, claimant owed the bank two notes of $1000 each and one note for $1335. They were signed by claimant (who lived in Cincinnati) and by his father, C. O. Netherton, as surety. He owed no others. The notes were renewed every six months.

The evidence discloses that finally one of the $1000 notes was sold by the bank to A. M. Dockery and the other $1000 note to J. H. Weldon, but neither claimant nor his father knew this. Each of the two men, Dockery and Weldon, kept their private boxes in the bank vault for safe keeping and the respective note so purchased by each of them from the bank, was left in his individual box for safe keeping and collection.

Thereafter the cashier of the bank, as alleged in the petition, abstracted the Weldon note from his box, and, after placing thereon a distinctive bank number, 41254, as if it were still an asset of the

bank, put it among said assets in place of a number of worthless notes owned by the bank which the cashier retired or removed from the live assets.

The cashier thereafter stated or wrote to claimant and his father that the bank had sold one of the $1000 notes, but now it was due for collection or renewal, and if claimant and his surety would execute a new note for $1040 (this extra $40 being to cover interest accrued), payable to J. H. Weldon, special, due six months after date with eight per cent interest, the bank would exchange it for the old note hereinbefore mentioned as sold to Weldon, and after procuring said old note of $1000, would send it to him. The note for $1040 payable to Weldon was then executed by claimant and his surety and sent to the bank and the cashier placed it in Weldon's private box to take the place of the note taken therefrom by said cashier and thereby hide the fact that it had been taken therefrom. But the cashier did not send the old note, for which the $1040 note had been given in renewal, to claimant but kept it in the bank's assets and later sold it and the other note of claimant to the Fidelity National Bank in Kansas City.

Finally, when said notes became due, claimant's father and surety paid the two $1000 notes in full with interest to the Fidelity Bank, and then paid, with interest, to Weldon's Administrator, the $1040 note which the cashier had obtained from claimant by falsely representing it to be in renewal of the note for $1000 sold by the bank to Weldon. Thus the result of the transactions was that the father, for claimant, not only paid the genuine notes really owed by claimant the son, but also paid the fraudulently obtained note of $1040 given to Weldon as a renewal of his note. The bank in the meantime getting and retaining the proceeds of the $1000 note which was kept and not sent to claimant as it should have been when the so-called renewal note was given.

Some correspondence was had between the president of the bank and claimant concerning the return to the latter of the old note sold by the Bank to Weldon, the president finally giving as reason for the delay the failure of the father C. O. Netherton, the surety, to come in and sign the renewal, and that as soon as he did so, the old note would be sent to him.

It is clear from the evidence that claimant and his surety originally owed three notes only, one for $1335 and the other two for $1000 each, but when C. O. Netherton returned from a trip to Colorado, after the bank had closed, he "found out there were *four* notes." Witness C. O. Netherton testified that he asked the cashier for the note of which the note just signed was a renewal, and the cashier said "it wasn't there" but said he would get it and send it to Earl (the plaintiff). Witness did not discover until after the bank closed what the facts were; and that "there was an extra note." He paid

them; he paid the Fidelity Bank the two notes sold by the Exchange Bank to the Fidelity National; paid $500 and the interest on the Dockery note and gave a new note for the remaining $500 due on the Dockery note. He paid the *$1040 note to the Weldon estate.* He paid the four notes because they were due and he was security on them. He did just what the cashier told him to do, to sign the new note (the $1040 one), and he would send the old one to plaintiff and witness supposed he did that. Witness knew that plaintiff "didn't have but the three notes originally; one was thirteen hundred and thirty-five dollars and the other two for $1000 each," and when witness returned from Colorado he "found out there were *four* notes at the time. I signed the ten hundred and forty note." Nothing was said between witness and cashier about the other notes "except that he would send him (plaintiff) this one note that this one (for $1040) was supposed to renew. There was nothing said only about this one note. . . . In other words, I have paid four notes, one to the Dockery estate, *one to Weldon* and two to the Fidelity."

On redirect examination, witness C. O. Netherton testified that he never borrowed any money from J. H. Weldon. "This ten hundred and forty dollar note *was supposed* to be *a renewal of a note* and forty dollars interest. I asked him (the cashier) about the forty dollars and he said it was interest. I thought it was *strange at the time* that the boy generally had been paying his interest, and I thought that was strange that he hadn't paid it, but I just didn't question it and signed it and went on. Mr. Weldon didn't pay me any money. I thought those notes were all in the bank. I didn't know anybody else had them at all. I had no knowledge of it. I relied absolutely on what Thompson (the cashier) told me. I never even went to investigate it at all."

The president of the bank testified that Netherton owed only the *three notes,* two $1000 notes, one of which belonged to Dockery and the other to J. W. Weldon and a *third* $1335, not belonging to the bank. "Those are the only three notes I know anything about. I don't know anything about this ten hundred and forty dollar note. I did call Doctor Thompson's attention to the matter. I told him that he had got in an extra note there on E. W. Netherton and would have to fix it in some way. I think he said he didn't know anything about it, and then finally he said it would have to be fixed. He said he would fix it. I told Doctor Thompson (the cashier) he had an extra note on Doctor Netherton and he said he would have to fix it, and he promised to fix it."

When defendant's counsel started to prove by the president of the bank (Homer Feurt) that the $1040 note to J. H. Weldon never went into the assets of the bank, plaintiff's counsel said:

"We will concede that it never was in the bank's assets, and never did belong to the bank. That is admitted, the ten forty note."

President Feurt further testified, ''But I do know what he (plaintiff) didn't owe a ten hundred and forty note so far as I know, because he had always sent the interest.''

It is manifest from plaintiff-claimant's petition, and from a careful examination of all the evidence in the case that the foundation of the claim for a preference depends upon the obtention by the bank of one of the $1000 notes, and what was done with the proceeds thereof. These matters clearly appear and form the justification for a preference in plaintiff's favor. If the proceeds of one of said $1000 notes were wrongfully secured by the fraudulent act of the cashier and went into the bank's assets to swell the same and still remain in said bank and were obtained from the plaintiff claimant without any value being given therefor by the bank, then the only way the bank can be compelled to right the wrong done to plaintiff by the bank's executive officer is to establish plaintiff's claim for the amount of the sum the bank's assets were thus enriched or increased to the detriment of plaintiff, and declare it a preference; and this, too, without regard to which of the two $1000 notes was used to accomplish the cashier's fraud, and regardless of the particular system of juggling of said notes used to cover up the transaction. Nor is the plaintiff's right to a preference affected in any way by the trial court's basing its judgment of allowance of the claim as a common one on the $1040, no part of the proceeds of which ever went into the bank's assets.

But on a careful study and analysis of the entire evidence it is manifest that matters stand thus: Through the fraud and dishonesty of the bank cashier, a *true* note of $1000 originally at first owned by the bank but assigned to and belonging to Weldon and kept in his envelope but which the aforesaid bank official had access to, was taken from its owner's receptacle and used by such dishonest official in taking the place of a $1000 of worthless notes. To conceal the absence of said $1000 note from Weldon's papers, the bank official prepared a so-called renewal note for $1040 (claiming the $40 was for interest), and fraudulently procured appellant's father C. O. Netherton, to execute, and said father did execute, the same without compelling the delivery to him of the original and true note of which $1040 was *thought* to be a renewal. The fraudulent $1040 note went into Weldon's envelope, and afterwards, C. O. Netherton paid all of the notes, including the false note of $1040 which appellant in fact did not owe and which payment went, not to the bank, but to Weldon, or rather to his estate. Plaintiff's right to a claim either common or preferred is not measured by the amount of the proceeds of the $1040 note. However, when Thompson, the bank's cashier, abstracted the *true* Netherton note of $1000 from Weldon's package or receptacle (which for safe keeping he kept in the bank), and substituted said abstracted true note for an equal amount of the

bank's worthless notes, and then later the bank sold said true note, which did not belong to it, and to which it then had no title. The bank got the proceeds thereof and has them yet. So that, without regard to the hocus-pocus or sleight of hand on the part of the cashier, the proceeds of said true Netherton note for $1000 so stolen by the cashier went into, and now swell, the assets of said bank. But, until Weldon was repaid the money represented by said note, it was Weldon who was entitled to claim the money thus held by the bank, since it was *his* money the bank wrongfully held. However, Weldon or his estate, has lost nothing in the end, since the Nethertons have paid him or his estate the $1040 note which the bank cashier wrongfully substituted for the true note in order to conceal the latter's absence from Weldon's package. Under these circumstances, the bank's assets have been swelled to the extent of Netherton's *true* note of $1000 assigned by the bank to Weldon and the bank still has the money arising therefrom; but since Weldon has been paid the full amount, and more, of loss he sustained through the abstraction by the cashier of the said true note for $1000 (payment of which was made by Netherton when he paid the $1040 fraudulent note wrongfully obtained by the cashier and substituted for the true $1000 note), Netherton is, in equity, entitled to be subrogated to, or allowed to claim under, the rights of Weldon; Plate Glass Underwriters Mut. Ins. Co. v. Ridgewood Realty Co., 219 Mo. App. 186, 194. And, in such proceeding plaintiff should recover from the bank to the extent it was enriched by the cashier's wrongful act in abstracting from Weldon's receptacle the $1000 Netherton note and giving the bank the benefit thereof.

If Weldon's estate had not been paid by Netherton, it would be entitled to have the amount of the note Weldon bought of the bank, and afterward stolen from it by the bank's officer, established as a preferred claim; but since Netherton, the claimant herein, has paid, and more than paid, said amount so lost, he should be subrogated to Weldon's right to recover the money from the bank so obtained from him by the wrongful act of its cashier.

"The right of subrogation does not necessarily rest in contract or priority, but upon principles of natural equity, and does not depend upon the act of the creditor, but may be independent of him and also of the debtor." [37 Cyc. 366-7; State Savings Trust Co. v. Spencer, 201 S. W. 967, 969; Berry v. Stigall, 253 Mo. 690; Davenport v. Timonds, 157 Mo. App. 360, 365, 366.]

"The doctrine of subrogation, under the initial guidance of Chancellor KENT, has been applied much more extensively in American than in English jurisprudence. The doctrine is much encouraged and protected. It is a doctrine which is highly favored and is not restricted in its application as formerly. The courts are inclined rather to extend than to restrict the principles so that although formerly the

right was limited to transactions between principles and sureties, now it is broad and expansive and has a very liberal application. It is no longer confined to cases of suretyship, but the doctrine has been steadily growing and expanding in importance, and becoming more general in its application to various subjects and classes of persons, the principle being modified to meet the circumstances of cases as they have arisen." [60 C. J. 706-7.]

"Right of subrogation or equitable assignment requires no contractual relation as its basis, since it is founded upon principles of equity and makes its appeal solely to the conscience of the court; *and where it is equitable that a person who has furnished money to pay a debt should be substituted for the creditor, such person will be substituted."* (Italics mine.) [Huff v. Rosen, 201 N. Y. Supp. 689; Olson v. Peterson, 128 Pac. 191.]

"When an obligation is discharged by one not primarily liable for it, but who *believes himself* to be acting either in performance of a legal duty, or for the protection of a legal right, or at the request of the party ultimately bound, and even in certain other cases, favored by public policy, where none of the above circumstances may be present, the party thus discharging the obligation is in equity entitled to demand, for his reimbursement, the performance of the original obligation, and the application thereto of all securities and collateral rights held by the creditor." (Italics mine.) [5 Pomeroy's Equity Jur. (4 Ed.), sec. 2343, p. 5183.]

It cannot be successfully maintained that claimant, or plaintiff, is not entitled to be subrogated because he is a mere volunteer. He is not.

"It is sufficient that the payment be made in performance of a *supposed* legal duty, and in good faith, *even though the party making the payment were not really bound."* (Italics mine.) [5 Pomeroy's Equity Jur., sec. 2343, Nord-Deutscher Lloyd v. President, etc., of Insurance Co., 110 Fed. 462; Sun. Mut. Ins. Co. v. Mississippi Valley Transfer Co., 17 Fed. 919.]

"A person who has paid a debt under a colorable obligation to do so, that he may protect his own claim, or *under an honest belief that he is so bound,* or who mistakenly but in good faith believes that he has an interest in property, to protect which he discharges a lien, will be subrogated." (Italics mine.) [60 C. J. 719; Jacobs v. Webster, 199 Mo. App. 604.]

"The volunteer is the man who, without any real or supposed interest of his own to protect, without the debtor's request, without any agreement with either debtor or creditor that he shall be put in possession of the creditor's rights, and without any equity in his own favor, intermeddles and pays the debt. The courts have no time for him. The term 'volunteer' is a very unfortunate one. Confusing its meaning in common language with its technical meaning,

courts have often denied subrogation where the unfortunate applicant, as a matter of justice and right, was clearly entitled to it.'' [1 Brandt. on Suretyship (3 Ed.), pp. 619, 620.]

The above is quoted with approval in United States Fidelity & Guaranty Co. v. McClintock, 26 Fed. (2d) 944, 948.

The plaintiff being entitled to a preferred claim in the amount of the proceeds of the *true* note of that amount that went into, and now is in, the assets of the bank, the judgment should be reversed and the cause remanded with directions to set aside the order made by the Commissioner rejecting said claim outright and entirely, and render judgment establishing a ''preferred claim'' in plaintiff's favor for the sum so swelling the assets of the said bank as hereinabove stated. This, I understand, is the result reached in Judge SHAIN's opinion and in that result, I concur.