No. 34,709

JOHN KATSCHOR, *Appellant*, v. DOCIA LEY, HAROLD LEY, HORACE LEY,
MRS. HORACE LEY and G. S. MCCURDY, *Appellees.*

(113 P. 2d 127)

Opinion filed May 10, 1941.

*Hal E. Harlan* and *A. M. Johnston,* both of Manhattan, for the appellant.

*F. M. Harris* and *B. W. Kelsey,* both of Ottawa, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This was an action to have it decreed that the principal defendants held in trust for plaintiff the title to certain real property, with a prayer in the alternative that plaintiff be subrogated to the rights of a certain mortgagee. A trial by the court resulted in judgment for defendants. Plaintiff has appealed.

The petition was filed April 27, and the amended petition September 20, 1938. In this it was alleged that W. F. Ley died intestate in July or August, 1937; that his estate had not been administered upon and that he left as his sole heirs at law his widow, Docia Ley, and two sons, Harold Ley and Horace Ley; that plaintiff is the equitable owner of a certain described tract of farm land of 140 acres in Franklin county; that W. F. Ley, at the time of his death, was the apparent owner of the land, as shown by the public records, and upon his death his only heirs at law became the apparent owners, but in fact the ownership of W. F. Ley in his lifetime and of his heirs now was and is colorful only, and that W. F. Ley did not in his lifetime and his heirs at law do not now have any actual ownership in the land; that about December 17, 1931, through the agency of the Mansfield Land & Loan Company of Ottawa, he contracted to purchase the land for $8,500, the land being then encumbered by a mortgage for $3,500; that he paid $500 at the time the contract was entered into, and on January 6, 1932, paid an additional sum of

$4,500; that the then owners of the real property conveyed the land to W. F. Ley by a general warranty deed, subject to the mortgage, which deed was duly recorded; "that said described real estate was, as aforesaid, purchased by plaintiff and conveyed to the said W. F. Ley without any fraudulent intent on the part of this plaintiff, the said W. F. Ley, or any other person, and such conveyance was accepted and received by the said W. F. Ley pursuant to an oral understanding and agreement between this plaintiff and the said W. F. Ley that he, the said W. F. Ley, was to hold the legal title to said described real estate in trust for this plaintiff, and that he would convey said premises to plaintiff on demand"; that W. F. Ley was a brother-in-law of plaintiff and plaintiff imposed special confidence and trust in him; that he represented and stated to plaintiff that he would move upon and occupy the land and farm the same in good workmanlike manner and protect the real estate and improvements thereon from waste if plaintiff would advance to him money from time to time to help him get started to farming, and that he would repay such loans and account for the rents arising from the farming venture; that plaintiff was a widower and had no permanent place of residence, and by reason of his advanced age it was impracticable for him to manage the farm; that for the purpose of holding the legal title thereto "W. F. Ley was the confidential agent and trustee of plaintiff, and said plaintiff believed and relied upon the said oral agreement"; that at the time of the conveyance and the oral agreement plaintiff had no creditors; that about December 29, 1931, W. F. Ley and his wife, Docia Ley, executed to G. S. McCurdy their promissory note for $3,500, payable November 1, 1936, and as security therefor executed a mortgage upon the real property in question for the purpose of renewing the mortgage of $3,500 upon the land at the time it was purchased; that plaintiff paid the note of $3,500, together with interest thereon and taxes upon the land, amounting to $4,072.61; that neither the sum of $5,000 originally paid by plaintiff upon the purchase price, nor the sum paid by plaintiff to retire the mortgage given by W. F. Ley and wife upon the property, have ever been repaid to plaintiff; that he paid the taxes upon the real property for 1932 at the request and with the consent of W. F. Ley, and for the purpose of protecting plaintiff's equitable interest in and claim to the real property; that it was necessary for plaintiff to make the payments of taxes and the principal and interest on the $3,500 loan to discharge the real estate from the lien created by the mortgage given

by W. F. Ley and wife to McCurdy, and in order that plaintiff might not lose his equitable interest in the property; that on April 29, 1935, plaintiff completed full payment of the $3,500 note and mortgage, which transaction was handled through the Peoples National Bank at Ottawa; that it was plaintiff's understanding that the holder of the note and mortgage, G. S. McCurdy, would assign the same to plaintiff, but that through mistake the mortgage was released of record; that about August 4, 1934, W. F. Ley and wife executed to G. S. McCurdy their second mortgage upon the real property to secure a loan of $500 without the knowledge and consent of plaintiff; that about January, 1938, he demanded of the heirs at law of W. F. Ley that they execute and deliver to plaintiff a proper instrument conveying to plaintiff the legal title to the real estate, but that such heirs, and each of them, failed and refused to do so.

The prayer was for a decree against the heirs of W. F. Ley requiring them to convey the property to plaintiff, or that the decree act as such conveyance, and in the alternative that if the court should for any reason fail to find for plaintiff respecting his ownership of the property that plaintiff be subrogated to all the rights theretofore owned and possessed by G. S. McCurdy under the $3,500 note and mortgage hereinbefore mentioned, and for such other and further relief as is just and equitable.

The defendants, Docia Ley, Harold Ley and Horace Ley, answered, admitting the residence of plaintiff and the death of W. F. Ley and their heirship, as alleged, and denying all other allegations of the petition. G. S. McCurdy, made a party defendant, filed no answer or plea to the petition.

The facts disclosed by the evidence, which were stipulated at the trial or are not seriously controverted, may be summarized as follows: In 1920, and for some time prior thereto, plaintiff and his wife lived about six miles north of Parsons, on a farm which he owned and operated. They had no children. His wife had a favorite brother, W. F. Ley, who with his wife and two sons resided at Pittsburg, and who was employed as a motorman on an electric interurban railroad. The families visited back and forth. Plaintiff's wife died September 4, 1920. After her death plaintiff found it impracticable for him to attempt to operate his farm. He sold the farm and converted his personal property into cash, realizing a total of about $9,000. This was about 1922. He invested this money in building and loan shares, or deposited it in banks at various places—at Parsons, Kan., and in

Oklahoma, Texas and Missouri. He lived for a few years in Oklahoma, then went to Illinois, where he worked as a laborer on highways for about five years. He returned to Kansas in 1930 and appears to have made his home, a part of the time at least, with his sister, who lived at St. Paul in Neosho county. W. F. Ley had wanted to get on a farm and engage in farming. Plaintiff shared his wife's good opinion of and kind feeling for W. F. Ley and his family and was particularly interested in the two boys, Harold and Horace. There was some talk between plaintiff and Mr. Ley and his family about plaintiff letting Mr. Ley have money to buy a farm, or the plaintiff investing in a farm, or buying a farm for the Leys to move upon and operate. The lack of clearness as to the nature of these talks, and as to what was eventually agreed upon, make it difficult to determine the present rights of the parties. In the late fall of 1931 plaintiff, W. F. Ley, and his son Harold Ley, started out to look for a farm. They visited a real-estate agent at Lawrence, W. W. White, who showed them several farms, but no purchase was made from him. They went to the Mansfield Land & Loan Company, in charge of Allen Mansfield, at Ottawa, and were shown several farms by D. L. Casida, who was connected with the Mansfield company. After looking at several places they decided to buy what was known as the Naylor farm. On December 17, 1931, a written contract was entered into by which the executor of the Naylor estate agreed to sell the property to W. F. Ley at the price of $8,500. There was a mortgage on the land of $3,500 held by G. S. McCurdy, which was to be assumed by the purchaser, and the balance of the purchase price was to be paid in cash—$500 on the signing of the agreement and $4,500 by January 20, 1932. Plaintiff made each of these payments. It took some time to get deeds executed by the several Naylor heirs, one of whom was a minor for whom a guardian had to be appointed and authority granted for him to convey the minor's interest. In the meantime and on December 29, 1931, W. F. Ley and his wife, Docia Ley, executed to G. S. McCurdy their note for $3,500, due November 1, 1936, with interest coupons attached, and also executed a mortgage upon the land then being purchased to secure the payment of the note. This was a renewal of the mortgage of $3,500 referred to in the contract of sale. The deeds were finally executed and the deeds and the mortgage executed by W. F. Ley and wife were filed for record April 25, 1932. In the meantime the Leys had gone into possession of the property and the plaintiff had executed to

W. F. Ley checks for various sums aggregating more than $900. With the moneys furnished by plaintiff Ley opened a bank account with the Peoples National Bank of Ottawa and used the money apparently for the purpose of buying livestock, feed and implements to get started in the farming business. For about a year plaintiff made his home with the Leys on the farm most of the time, usually spending the week-ends visiting with his sister at St. Paul. On February 18, 1933, he paid the taxes for 1932 on the land, amounting to $127.61, and on October 26, 1933, paid the premiums, $36, on the insurance policy for the buildings on the farm. He paid as they came due the interest coupons upon the $3,500 note executed by W. F. Ley and wife and secured by a mortgage on the farm, and paid on the principal $500 October 18, 1932, $2,000 October 26, 1933, and the balance of the principal, $1,000, on April 29, 1935. These payments were all made through the Peoples National Bank of Ottawa, either in person or by mail. Plaintiff testified these payments of taxes and on the mortgage were made to protect the interest he "figured" he had in the land. Under date of May 8, 1935, W. D. Devilbiss, vice-president of the bank, wrote plaintiff as follows:

"According to arrangements made when you were here and paid the balance due on the W. F. Ley mortgage, we have had same released of record and are enclosing you herewith the mortgage together with the coupon bond canceled to which is attached four interest coupons, all of which have been canceled.

"I trust that these will reach you safely and will ask that you please acknowledge receipt."

On May 11, 1935, plaintiff wrote the bank as follows:

"Dear Sir: Papers rec. but you claim they were made according to arrangement? but whoms arrangement. I did not ask you to cancel the Nots, did I? they were not mentioned in my presents."

Under date of May 13, 1935, Mr. Devilbiss, for the bank, wrote plaintiff as follows:

"We have yours of the 11th regarding the release and cancellation of notes which we sent you on May 8th, and I am sorry that this has not been handled satisfactorily for it was my understanding that as soon as your check which you made in payment was cleared, that the mortgage was to be released and sent to you. This, of course, carries with [it] the cancellation of the notes because the mortgage would not be of any benefit after having been released.

"You will remember that it was suggested in the presence of Mr. McCurdy that you could take a new mortgage in lieu of your having paid this one.

"I trust that this explanation will clear the matter for you."

In the meantime and in 1934 W. F. Ley and wife had executed a second mortgage on the land to G. S. McCurdy to secure a note for

$500. Plaintiff did not know of this until after he had made the final payment on the $3,500 mortgage. Later he paid interest coupons on this $500 second mortgage to the amount of $90. It is not clear from the record just when plaintiff ceased to make his home with the Leys on the farm. It was sometime in 1933. He appears to have made his home, or at least his headquarters, for a time with his sister at St. Paul, but for some time before this action was brought he was living in Wabaunsee county, doing farm work. W. F. Ley died August 24, 1937, intestate. There was no administration upon his estate. He left as his sole heirs at law his widow, Docia Ley, and two sons, Harold and Horace Ley. Perhaps in December, 1937, plaintiff wrote Docia Ley asking for some rent from the land and received no reply. A little later he wrote her, enclosing a quitclaim deed to him for the land, which he asked her and her sons to sign. She replied by a postcard, mailed January 18, 1938, as follows:

"Ottawa, Kans.
"Mr. John Katschor, Alma, Kans.

"Received your letter, will say I will be glad to have you come down some time to talk things over. Will talked a great deal to me before he left us. I did not have time when you were here last Aug. to talk shall be glad to do so whenever you can come. We have all worked hard this fall, had lots of debts to pay, have had to figure awfully close. Hope you are well.

"Sincerely, D. M. Ley."

A few weeks thereafter plaintiff took his attorney with him and went to see Mrs. Ley. When she found plaintiff had an attorney with him she declined to talk with them and consulted her attorney, with the result that no agreement was reached, and this action was brought. Plaintiff testified that while he and W. F. Ley were present in Mansfield's office when the contract was being prepared, Mr. Mansfield asked: "In whose name shall I make the deed in?" and plaintiff replied: "Mr. Ley's, he will hold it for me until I need it. He can give me a quitclaim deed." On the point Mr. Casida testified:

"When we got ready to draw the deed we asked Mr. Ley and Mr. Katschor, they were both there, who the deed should be made to. Mr. Ley said that it would be made to him and Mr. Katschor said that was right. Then I asked them also if they had any papers they would want to make out or any agreement and they both said no, not at the present."

Plaintiff further testified that Mr. McCurdy was at the bank when he made the last payment of $1,000 on the $3,500 note and mortgage, and "When I give them the check I wanted the rest of my papers. He said, 'You can't have them yet. The check may not be good.'

I said, 'This looks funny to me.' Then what could I do? I walked away."

Considering defendants' demurrer to the evidence, the court treated plaintiff's case as though his petition contained two causes of action—one to impress a trust upon the land and the other to be subrogated to the rights of the mortgagee McCurdy. The court sustained the demurrer to the first of these propositions and overruled it as to the second.

The testimony of witnesses called by defendants, insofar as it relates to the purchase of the farm, the payments plaintiff made on the contract of purchase, and later on taxes and insurance, the $3,500 and the $500 second mortgage, his motives and purposes in doing so, and the oral agreement, if any, between plaintiff and W. F. Ley, may be summarized as follows: Allen Mansfield was present when the contract of purchase was written. Plaintiff and W. F. Ley were there. They said, "They would buy the farm and that Mr. Ley— the contract would be made to Mr. Ley—with Mr. Ley and the payment for it was made by Mr. Katschor." Pressed as to what plaintiff said about the $3,500 note and mortgage mentioned in the contract, he answered: "Well, I just don't recall . . . the exact conversation that was had about the $3,500." W. W. White, engaged in the real estate business at Lawrence, showed three or more Douglas county farms to plaintiff and W. F. Ley in the fall of 1931, but sold none. He testified that while he was with them there was a joint conversation, the substance of which was that Mr. Katschor was paying for the farm and Mr. Ley was to have the farm. The farm was to be the property of Mr. Ley after the deal was completed and Mr. Katschor was supposed to live with them whenever he felt like it, but he was not bound to stay there. Mrs. E. R. Warden, who at the time of the trial was living in Wichita, was a friend of the Leys, having lived with them in their home in Pittsburg from September, 1922, to October, 1923. While there she became acquainted with plaintiff, who visited the Leys several times; that in her conversations with plaintiff she said he had been looking around at farms; that the farms in Oklahoma were not very good and that he wanted the Leys to have a farm; that he wanted to buy them a good farm; "if his wife had lived that she would have done a lot of things for the Ley boys and for Mr. Ley, and that he was buying the farm, or would buy the farm for Mr. Ley because his wife would have wanted him to had she lived;" that she met plaintiff again at the

Ley home about 1925. "He was still looking for the farm, but he was anxious to get a good farm, because the Leys had a nice home there in Pittsburg. He felt anything he would buy would have to be as comfortable as what they would be going out of." She saw him again at the Ley home for just a little while the evening they had made the contract for the purchase of the farm. Plaintiff said he "believed they had found the place they were looking for." After that they discussed the farm for some time. Plaintiff said, "always that he was buying the farm for Leys." The witness saw plaintiff on the day of the funeral of W. F. Ley and while the witness was trying to comfort Mrs. Ley plaintiff said to her, "You don't need to worry about her. She has her own home and she will be well taken care of."

Docia Ley, widow of W. F. Ley and principal defendant, testified she and her husband were married in 1905 and lived at Pittsburg, Kan., until the spring of 1932, when they moved on the farm in question; that she became acquainted with plaintiff a year or two after her marriage, and over the years saw him two or three times a year, sometimes oftener; that her husband had an ambition to have a farm and engage in farming, and this was discussed at various times over the years; that after the death of plaintiff's wife, about 1920, plaintiff was in Oklahoma and later in Illinois, but when in Kansas made his home with his sister at St. Paul. The first real talk with him about buying the farm was about February, 1930. Plaintiff spoke of having $6,000 invested in a building and loan association in Texas and talked of letting Mr. Ley have that money to use in purchasing a farm, but a little later said he had agreed to leave the money in Texas for another year, and no real effort was made to buy a farm until in the fall of 1931. In the meantime the matter was talked over in the Ley home and at times with plaintiff, as would be natural with any other business matter; that plaintiff spoke of "investing" his money in a farm for Mr. Ley and his family. At other times he spoke of buying a farm for Mr. Ley and his family. He was interested and wanted to be of help to Mr. Ley and his family, and particularly wanted their two sons to have an opportunity on the farm. Beginning in September, 1931, plaintiff and Mr. Ley made several trips to look at farms. Plaintiff wanted to buy a good farm, but no definite amount to be invested or to be used in the purchase of the farm was mentioned or discussed. Plaintiff was a believer in spiritualism, and consulted a medium of that faith in an

effort to learn if what he was doing, or was about to do, was in accord with the wishes of his deceased wife, and learned that it was. Mrs. Ley did not go with them on any of the trips when they were looking for farms and was not present when the contract for the purchase of the farm in question was executed, but on the day it was executed, after their return home, the plaintiff expressed satisfaction with the farm and with the purchase of it. Mrs. Ley knew that plaintiff let her husband have some money to get started in the farming business, but did not know of the several checks plaintiff had made to her husband, or the amount of them, although they aggregated about $900. Neither did she know of what arrangement or understanding the plaintiff and her husband had concerning the purchase of the farm, or the money plaintiff advanced, and testified there was no arrangement or understanding between them. That after they moved on the farm in the spring of 1932 plaintiff made his home with them for about the first year, dividing his time between that place and the home of his sister; that Mrs. Ley and her husband executed the note for $3,500 and the mortgage on the farm to secure it; that plaintiff paid the interest coupons as they became due and also paid the principal; that on some occasions when he paid the interest she went with him to the bank and when the coupon was given to him he turned it over to her, and in some instances when the coupons were paid by mail the bank sent the coupons to her. She had four of them, which were introduced in evidence, but thought perhaps more of them were given or sent to her. After plaintiff had made the last payment on this mortgage he was at their home and learned or had discovered that she and her husband had placed a second mortgage on the farm for $500. He said he did not know about that; that if they had told him they needed money he would have tried to let them have it; and later when talking with the witness alone he specifically asked her not to mortgage the place again. She was uncertain what reply she made. Her husband died August 24, 1937. A few months later she received a letter from plaintiff asking for part of the rent. This she did not answer. She later received a second letter from him enclosing a quitclaim deed to him for the land and asked that she and her sons execute the deed. It was in response to this letter that she wrote the card mailed January 18, 1938.

Harold Ley, 33 years of age, son of W. F. and Docia Ley, and one of the defendants, had been acquainted with plaintiff for many

years and had heard plaintiff talk of purchasing a farm for his father. He said "He was going to purchase a farm for my father, as that was what his wife wished." He stated that in substance many times. He first heard this talk in 1929, "as near as I can recall." In the fall of 1931 the witness went with his father and plaintiff to look for a farm, and made as many as three trips with them. He was with them and Mr. Casida when they looked at the farm which was purchased. After the farm was purchased plaintiff told witness "that he was satisfied that he had bought this farm as my father liked it." The witness was not present in Mansfield's office when the contract of purchase was made and did not know what the arrangement was between his father and the plaintiff. At Christmas time in 1935 the witness went with plaintiff to attend a spiritualistic meeting in Guthrie, Okla. "We sat in a circle and this trumpet would answer any question you would ask it, which was supposed to be a voice of someone that had gone over beyond." Plaintiff asked, "If I remember correctly, he asked if he had done what she had wished. . . . After they had sat there this trumpet told him, which was supposed to be Aunt Mary, the deceased wife, he had done the proper thing." The witness went with his parents when they moved to the farm and stayed there until July of that year, and then went to Kansas City. When he was there plaintiff would go out over the place and express satisfaction with the farm and that the witness's father liked it.

Inez Drake, a sister of Docia Ley, testified by deposition. For many years she made trips with her husband, who traveled. She met the plaintiff at the home of her sister, Mrs. Ley, in Pittsburg in the fall of 1920, after his wife's death. At that time plaintiff "said in substance that he wanted to invest the inheritance that his wife had received from her mother in the land for Will Ley; that was his wife's desire." About eight years later she saw the plaintiff again at her sister's home in Pittsburg and had a conservation with him in which "he said that he would like to see my brother-in-law's sons on a farm, and he asked Mr. Drake what he thought about him investing Mary Katschor's inheritance money in land, and how he thought it would be to put the boys on a farm." In the course of the conversation plaintiff said "that he wanted the deed made out to Will [W. F. Ley] because Mary wanted him to have the inheritance." She met the plaintiff again in the spring of 1932 when she was visiting her sister, Mrs. Ley, at the farm in question. At that

time plaintiff "said in substance that he had finally invested Mary, his wife's money in this land for Will, the brother, Will Ley, the brother."

Respecting the inheritance which his wife received from her mother, plaintiff testified that this amounted to about $1,800 at the time of the death of his wife; that the money was then invested, and as soon as he could get it, which was in 1922, he sent all of it to W. F. Ley; that at no time did he talk about investing that money in a farm. Docia Ley was examined on this point and said plaintiff had sent her husband money. She did not know whether it was $1,800 or some other amount; neither did she know whether it came from plaintiff's wife's inheritance or some other source, nor when it was sent, and stated that she was unable to give the court any information about it.

On behalf of appellant it is argued there was sufficient evidence to have justified the trial court in granting the relief first suggested by plaintiff in the prayer of his petition, namely, that the principal defendants hold the land in trust for plaintiff. This argument is predicated upon our statute (G. S. 1935, 67-406) which lays down the rule that "when a conveyance for a valuable consideration is made to one person and a consideration therefor paid by another, no use or trust shall result in favor of the latter"; and G. S. 1935, 67-408, which provides that this rule shall not extend to cases "where it shall be made to appear that by agreement and without any fraudulent intent the party to whom the conveyance was made, . . . was to hold the land . . . in trust for the party paying the purchase money or some part thereof." It is pointed out that the written contract for the purchase of this land called for a cash payment of $5,000, and the evidence discloses plaintiff paid at least that part of the purchase price. That he did so is conceded by defendants. Appellant points to the testimony of plaintiff that at the time he was not indebted to anyone, and that there was no fraudulent intent respecting the transaction on the part of anyone. This is not controverted. Appellant points also to the testimony of plaintiff that at the time the contract was being made, in answer to a question by Mr. Mansfield as to in whose name the deed was to be made, replied: "Mr. Ley's, he will hold it for me until I need it. He can give me a quitclaim deed," and the testimony of Mr. Casida that after the deed had been prepared he inquired of plaintiff and Mr. Ley if they desired any other papers or agreement made out,

and that they both said, "No, not at the present." Except as this oral testimony may tend to show it, there was no evidence before the court as to what the parol agreement between plaintiff and W. F. Ley was. The evidence tends to indicate that only two persons knew what was the oral agreement or understanding between plaintiff and W. F. Ley, and the voice of Mr. Ley had been stilled by death and that of the plaintiff by our statute, G. S. 1935, 60-2804. It is true the defendant Docia Ley testified there was no arrangement, but obviously this was a conclusion not based on any fact, for she testified with respect to various aspects of the matter that she did not know what their understanding or agreement was. The other defendant who was a witness, Harold Ley, was not present when the written contract was made for the purchase of the land and did not know what parol agreement there was between his father and plaintiff. The testimony of Mrs. Warden and Inez Drake pertained to some general statements made at various times by plaintiff, none of which bore directly upon the contract for the purchase of this land, and although they were controverted by plaintiff, even if given full credence they have no evidential value bearing upon the oral agreement or understanding between plaintiff and W. F. Ley. Even though it were conceded that evidence on plaintiff's behalf tended to support the allegations of plaintiff's petition of "an oral understanding and agreement between this plaintiff and the said W. F. Ley that he . . . was to hold the legal title to said described real estate in trust for this plaintiff, and that he would convey said premises to plaintiff on demand," it is clear that the evidence is short of clearly establishing such an agreement. Appellant concedes the court was not bound to believe the testimony of plaintiff and of Casida bearing on that matter, and without it there is little, of course, to support that view.

In a written opinion filed after all evidence had been received the court makes it clear the evidence offered on behalf of defendants was considered by the court as a "defense to the whole claim of plaintiff." In view of this situation counsel for appellant do not seriously contend the judgment of the trial court should be reversed with directions to enter a decree that the defendants, heirs of W. F. Ley, hold the land in trust for plaintiff, and we are of the opinion we would not be justified in reversing on this ground.

It is argued on behalf of appellees that plaintiff, having contended in the prayer of his petition that he is entitled to a decree that the

defendant heirs of W. F. Ley hold the property in trust for him, he elected his remedy, and cannot contend that he should be subrogated to the rights of G. S. McCurdy under the $3,500 mortgage. We think this point is not well taken. Plaintiff in his petition pleaded all the facts as he understood them to be. The purpose of the prayer was to set forth the kind of relief plaintiff thought he would be entitled to. The fact that he made two suggestions in the prayer, we think does not amount to an election of remedy, even though they are necessarily predicated upon different theories. The prayer contained the request for such other and further relief as the court should find equitable. This was a suit in equity, and perhaps all that is essential in the prayer was for such relief as the court should find to be equitable. The fact plaintiff particularizes the kind or kinds of relief he thought he might be entitled to under the facts pleaded does not amount to such an election of remedy as would preclude him from having one or the other, as the evidence would warrant.

On behalf of appellant it is argued that in any event plaintiff should have been subrogated to the rights of G. S. McCurdy under the $3,500 mortgage. There is much merit to this contention. In announcing its decision upon this branch of the case the court, among other things, said:

"It is true that subrogation is something that receives a good deal of attention but it requires an agreement and understanding of some kind. It requires some positive action on the part of the person who claims subrogation and a lapse of time and failure to do anything sometimes may be taken as evidence that he was satisfied with the way things were."

On behalf of appellant it is argued the court erred in its view of the law that the application of the doctrine of subrogation "requires an agreement and understanding of some kind." The point is well taken.

In 60 C. J. 807, under the title "Subrogation" and the subtitle "Third Persons Advancing Means to Discharge, or Discharging, Debt or Encumbrance Securing Such Debt," the general rule is stated as follows:

"It always requires something more than the mere payment of the debt by a third person in order to entitle such person to be subsituted in place of the original creditor; it requires an assignment, legal or equitable, from the original creditor, or an agreement or understanding on the part of the party liable to pay that the person furnishing the money to pay the same shall in effect become the creditor, or the person furnishing the money must have done so be-

cause he is liable as surety or other secondary capacity, or for the purpose of protecting some real or supposed right or interest of his own."

This language is taken verbatim from the opinion of this court in *Crippen v. Chappel,* 35 Kan. 495, at page 499, 11 Pac. 453, where it continues as follows:

"But the right of subrogation or of equitable assignment is not founded upon contract alone, nor upon the absence of contract, but is founded upon the facts and circumstances of the particular case and upon principles of natural justice; and generally, where it is equitable that a person furnishing money to pay a debt should be substituted for the creditor or in the place of the creditor, such person will be so substituted."

On this point it is said, in 60 C. J. 700:

"The right of legal subrogation is not a matter of contract; it does not arise from any contractual relation between the parties, but takes place as a matter of equity, with or without an agreement to that effect. It is not dependent on privity or founded on, or dependent on, contract or on the absence of contract, but is independent of any contractual relations between the parties. Nor does the right depend upon the act of the creditor, but may be independent of him and also of the debtor."

In support of the text many authorities are cited, including from our own state: *Crippen v. Chappel,* supra; *Lynds v. Van Valkenburgh,* 77 Kan. 24, 93 Pac. 615; *Olson v. Peterson,* 88 Kan. 350, 128 Pac. 191; *Breyfogle v. Jackson,* 113 Kan. 373, 214 Pac. 779; *Blitz v. Metzger,* 119 Kan. 760, 241 Pac. 259; 120 Kan. 555, 245 Pac. 161; and *Federal Land Bank v. Hanks,* 123 Kan. 329, 254 Pac. 1040.

See, also: *Deposit Co. v. City of Stafford,* 93 Kan. 539, 144 Pac. 852; *Waddle v. Bird,* 126 Kan. 255, 267 Pac. 974; *Spradling v. Hawk,* 133 Kan. 545, 1 P. 2d 268.

In the recent case of *Home Owners' Loan Corporation v. Henson,* (Ind.), 29 N. E. 2d 873, it was said:

"The right of 'subrogation' is not founded on contract, express or implied, but on principles of equity and justice, and includes every instance in which one party not a mere volunteer, pays a debt for another, primarily liable, and which, in good conscience, should have been paid by the other."

To the same effect, see the late cases of *People v. Phillip State Bank & Trust Co.* (Ill. App.), 30 N. E. 2d 771; *Netherton v. Farmers Exchange Bank,* 228 Mo. App. 296, 63 S. W. 2d 156, and *McCracken County v. Lakeview Country Club* (Ky. App.), 70 S. W. 2d 938. Appellant stresses the portion of the texts above quoted authorizing subrogation when a person pays "for the purpose of protecting some real or supposed right or interest of his own."

In 25 R. C. L. 1345 it is said:

"Where subrogation is claimed on the ground that the payment was necessary to protect the interests of the subrogee, the extent or quantity of the interest which is in jeopardy is not material. If he has any palpable interest which will be protected by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as the creditor could."

In the recent case of *Banks v. Cartwright* (Tex. Civ. App.), 26 S. W. 2d 708, it was said:

"One paying debt to protect his property or interest is not volunteer, as regards subrogation."

And in *Schuetz v. Schuetz* (Wis.), 296 N. W. 70, it was held:

"Where a person, as a result of a mistake of law, supposes himself to have an interest in land, he is treated as having such an interest for purposes of 'subrogation' and as being within the rule entitling a person to subrogation in cases where he of necessity acts to protect his own interest."

Counsel for appellees cite no authorities on this branch of the case and in their brief say:

"We have no criticism of the abstract principles of subrogation which are outlined in the brief of the appellant. The difficulty with them is that they are not applicable to the facts of this case. This is a 'fact' case. The court heard all of the evidence, and decided against the appellant, and that he was not entitled to this right of subrogation."

This is followed with an argument that the evidence sustains the judgment of the court. On the point respecting plaintiff's claim to subrogation the legal question for this court to determine is whether there is substantial competent evidence to support the judgment of the trial court. Appellees rely upon the parol testimony of witnesses called on their behalf. Hereinbefore we have summarized the testimony of each of these witnesses. Collectively it may be said to show that W. F. Ley was the favorite brother of plaintiff's wife. Had she lived she would have helped him in some indefinite way. She wanted him to have, after her death, what she had inherited from her mother. There is no serious contention that the farm in question was purchased with the proceeds of that inheritance; neither is there any competent evidence to sustain that view. Plaintiff thought well of W. F. Ley. Perhaps it is not going too far to say they thought well of each other and that each had confidence in the other. Plaintiff thought well also of the family of W. F. Ley, and having no children of his own, was particularly interested in the two Ley boys. After his wife's death in 1920 plaintiff sold his farm and other property and lived for several years in Oklahoma

and later for several years in Illinois, returning at intervals to Kansas, where he made his home with his sister, who lived in St. Paul, Kan. Over these years he visited the W. F. Ley family two or three times a year, sometimes oftener. All this time W. F. Ley was employed as motorman on an electric interurban railway. He and his family lived in a comfortable home, but there is no evidence that he owned it; indeed, the contrary might well be concluded, since he seemed to have had no financial assets of his own at the time the farm in question was purchased. He had a yearning or ambition to live on a farm and engage in farming. Plaintiff, having lived on a farm most of his life, talked about farms and somewhat indefinitely about buying a farm, or investing in a farm, to be owned or occupied by W. F. Ley and his family. However, there was no serious talk about purchase of a farm until perhaps early in 1930. Mrs. Ley fixed the date in February of that year; her son Harold, although very indefinite about it, fixed the time late in 1929. At that time plaintiff said he had about $6,000 in a building and loan association and talked of letting Mr. Ley have that money to use in buying a farm. The terms on which he was to let Mr. Ley have the money were not testified to by any witness, and apparently were unknown to them. A little later plaintiff said he had agreed to leave the money where it was for another year. The talk was not definitely renewed until in the fall of 1931. Plaintiff then talked of "investing" in a farm, or of "buying" a farm for Mr. Ley. No amount which he planned to so invest or use was stated by plaintiff, and the kind of a farm to be purchased was a "good" farm. None of the witnesses called on defendants' behalf knew what agreement or understanding there was between plaintiff and W. F. Ley with respect to the terms of the purchase, or the manner in which it should be handled, except that it was planned that Ley and his family would move upon the farm and farm it.

As it pertains to the purchase of the farm in question and the payments made thereon, reliance must be had almost exclusively on the written evidence. W. F. Ley, as purchaser, alone executed the contract of purchase, and the deed named him as the sole grantee. Since plaintiff could not produce evidence to sustain his allegation that he and Ley had an oral agreement to the effect Ley was to hold the title for him, no finding of that kind can be made, and it must be held that the title to the land passed to W. F. Ley, even though plaintiff paid the cash consideration of $5,000. The note for $3,500 and the mortgage given to secure it were executed by W. F.

Ley and Docia Ley, his wife. It was their obligation. Nothing in the contract, deed, note or mortgage indicates any liability on the part of the plaintiff to pay this note. The witness Mansfield was asked in substance if plaintiff was to pay this mortgage as well as the cash of $5,000 and testified he remembered no statement of the parties about who was to pay the $3,500 note. So, on the question of who was liable on the note and mortgage we are bound by the record evidence only. Plaintiff paid this $3,500 note and interest thereon. This is conceded. Did he intend to make a gift of that to the Leys? Again we think the record evidence and such oral testimony as explains it is the only competent evidence on the subject. The last payment on this note was made at the bank. Plaintiff testified that he asked for his papers and was told his check might not be good and that he could not have them then. When the check cleared the note was then marked "paid," the mortgage was released of record, and the papers sent to plaintiff. He promptly objected; said he had not asked that the note be canceled. The banker's reply indicated that when plaintiff left his check to pay the note he wanted an assignment, and Mr. McCurdy had told him he could get another mortgage. We pass the thought that McCurdy might have been looking out for his own interests by giving such advice, since he had a second mortgage on the land. The correspondence clearly shows plaintiff did not intend for the note to be marked "canceled" or the mortgage to be released, and that is the principal idea important here. We take note of the fact that McCurdy was made a party defendant to this action, that he did not answer or otherwise plead, neither did he appear as a witness. From this it may reasonably be concluded he had no defense to plaintiff's claim of subrogation and that he could offer no testimony tending to controvert the obvious meaning of this correspondence.

One who has no interest in mortgaged property, and who voluntarily pays the debt of another, secured by a mortgage thereon, is not entitled to subrogation. We think the evidence in this case will not support a holding that the payment of this mortgage by plaintiff was voluntary. On the contrary, it discloses that he paid intending to get a transfer or assignment of the mortgage. In his language, he wanted the papers turned over to him and not to have the mortgage canceled. More than that, from any view taken of the evidence, plaintiff had some interest in the mortgaged property. Even testimony on behalf of defendants indicates that he was to

have the right to make his home on the property purchased, and the testimony of Mrs. Ley is that he did make his home there for about the first year. He paid the taxes for 1932 on the property in February, 1933, and in October, 1933, paid the premium covering insurance on the buildings. He testified he made these payments to protect the interest which he "figured" he had in the property. When he learned of the second mortgage of $500 on the property he asked Mrs. Ley not to mortgage it again without his knowledge. He testified that she promised him she would not. She did not deny that statement, but was unable to recall what reply she did make to plaintiff. When sometime in the fall of 1937 he wrote her for some of the rents from the property she made no claim that he had no interest. In fact, she did not answer the letter. When he did not hear from her and wrote enclosing a quitclaim deed to him for the land, to be executed by Mrs. Ley and her sons, she replied asking him to come down and talk it over, and made no claim that he had no interest in the property. Hence, we think it must be held as a matter of law that plaintiff did have an interest in the property. More than that, he might reasonably have believed that he had a greater interest than he has been able to prove in this case.

Under the authorities above set out, and under the substantial, competent evidence we find in the record, we think the trial court erred in denying plaintiff the right of subrogation with respect to the payments he made on the $3,500 note and mortgage. We think, also, the suggestion that plaintiff is barred by his laches is not well taken. (See note in 103 A. L. R. 1182.)

The judgment of the court below is reversed with directions to the court below to enter judgment in harmony with the views herein expressed.

WEDELL and HOCH, JJ., dissent from paragraph 5 of the syllabus and corresponding portion of the opinion.