CITIZENS STATE BANK OF TRENTON, Appellant, v. NATHANIEL SHANKLIN, Respondent.

Kansas City Court of Appeals, November 17, 1913.

1. **INSANE PERSONS: Judgment: Notice: Collateral Attack.** A judgment of the probate court adjudging a person to be insane which shows that such person was never notified of the proceedings is void, notwithstanding it notes that he was confined in an asylum, and may be collaterally attacked; and the appointment of a guardian is likewise void.

2. ————: **Restoration Proceeding.** The fact that an insane person, after several years, is restored and proceedings were then begun in the probate court to have him declared sane and his guardian discharged of which he has no notice and with which the only connection he was shown to have was that he was in court as a witness, is not an admission of the validity of the original proceeding which declared him insane without notice.

3. ————: **Guardian and Ward: Expenditures: Collateral Kin.** A guardian of an insane person and the court under which he acts are not so restricted in administrating his estate as is an administrator. The court may authorize expenditures by the guardian, if the estate will justify it, which it is convinced the insane person would have done if in his right mind; and expenditures may be made in some instances for needy collateral heirs.

4. ————: **Court's Discretion: Intruding Guardian.** While a guardian, under direction of a proper court, may make expenditures to collateral relatives and otherwise act as the court is convinced the insane person would if he had been in his

right mind, yet the instances in which the guardian may so administer the estate are those in which a court with jurisdiction has a supervision over the guardian and in which its discretion will protect the estate, and do not extend to a guardian who intrudes himself into the guardianship.

5. ———: Intruding Guardian: Accounting: Necessaries. One who assumes to act as a guardian for an insane person, without a valid appointment, and who makes expenditures in behalf of his ward may have an accounting and be allowed as credits all expenditures for necessaries for the insane person and his family.

6. ———: Necessaries: Life Insurance Premiums: Children over Majority. Necessaries for the family of an insane person which a guardian may provide, do not include money given to a married son more than thirty years old; nor to a daughter for medical attention who was over twenty-one years of age and who was living to herself and earning her own living; nor will it include burial expenses for such daughter. But payments of premiums on life insurance taken out by the insane person when in his right mind, are necessaries and should be allowed as a credit to one who acted as guardian under a void appointment.

Appeal from Sullivan Circuit Court.—*Hon. Fred Lamb,* Judge.

AFFIRMED.

*D. M. Wilson* and *Hall & Hall* for appellant.

*J. W. Bingham, O. M. Shanklin, Collier & Robinson* and *J. P. Butler* for respondent.

ELLISON, P. J.—Plaintiff's action is set out in a petition containing two counts and is founded on an itemized account. One of the counts is drawn upon the idea that the items of the account were furnished to defendant himself; while in the other, it is stated that the defendant was insane at the time the items accrued and that they were furnished to his guardian. At the close of the evidence in plaintiff's behalf the trial court gave a peremptory instruction to find for defendant.

The case is presented practically altogether on the second count. The items are payments made by the plaintiff bank to Hughes as guardian of defendant. These items cover a period of several years, beginning in 1903, and total a sum of $9214,20 credited with $6710.71, leaving a balance of $2503.49, for which judgment is asked. Counsel have divided this gross balance into four claims, viz.:

Amount paid Jimmie Shanklin ......$ 195.40
Amount paid out for life insurance 1714.47
Amount paid out for Ida Shanklin 2585.25
Interest at 6 per cent on the different items paid out ............ 1006.37

It was admitted at the trial that defendant "was insane and incapable of transacting ordinary business affairs from November, 1895, until July, 1910, and was in that condition continuously between those dates." The evidence shows, and it is practically conceded, that the probate court of Grundy county declared defendant to be insane on the 11th of March, 1896, after a trial had by a jury, the judgment showing the following on its face:

"Comes now on to be heard the inquiry into the sanity of Nathaniel Shanklin on the information of C. L. Berry, heretofore filed, and it appearing to the court that said Nathaniel Shanklin is now confined in a hospital in the city of St. Louis and unable to attend and be present at said inquiry or be served with notice thereof, it is ordered that said proceedings be held without his presence and without notice being served upon him of said proceedings."

C. L. Berry was first appointed his guardian who, after serving until 1898, resigned and H. J. Hughes was appointed and qualified to succeed him and, as just stated, he obtained the money from plaintiff bank and expended it in various ways, but the particular expenditures over which this controversy has arisen,

174 Mo. App.—41

with interest thereon, are as stated and set out above. The evidence shows that Berry and Hughes each assumed to act as guardian and that plaintiff furnished the money to Hughes for the purposes above stated.

But defendant insists that the proceedings in the probate court adjudging the defendant to be insane, and appointing a guardian are void, since they were had without notice to defendant, as is shown upon the face of the judgment we have set out. This objection to the judgment must be sustained. The statute in force when the adjudication was had authorized the proceeding to be instituted and carried on to judgment and the appointment of a guardian, without notice, if the court placed upon its record "the reason why such notice" was not required. A similar statute was construed and accepted as being a valid enactment in Dutcher v. Hill, 29 Mo. 271, and other cases since. But in Hunt v. Searcy, 167 Mo. 158, the Supreme Court, in an opinion by MARSHALL, J., after expressing surprise that the validity of the statute had not theretofore been questioned declared it to be in conflict with both the Federal and State Constitutions, and that a proceeding in the probate court without notice to the alleged insane party was void collaterally as well as directly. This statute has been allowed to stand since such decision and has been carried into the revision of 1909, section 476. But it must be treated as a void provision and the proceedings had under it in this case declaring defendant to be insane and appointing a guardian for him must be held void, unless they are cured by the following further consideration.

Defendant's mind became restored and he was declared to be sane by proceedings instituted in the probate court. Plaintiff claims that he appeared in that proceeding and thereby recognized and validated the original adjudication of his insanity. In this connection counsel say the whole opinion in Dutcher v. Hill was not overruled in Hunt v. Searcy, and that the lat-

ter portion of it, which states that though the pro-
ceedings adjudging insanity were "irregular" for
want of notice, yet if, after regaining his mind, the
party affected came into court and asked to be re-
lieved from the custody of his guardian for the reason
that his mind was restored, it amounted to an admis-
sion of record that the proceedings against him were
valid.

We are relieved from the necessity of saying
whether Hunt v. Searcy, should be held to condemn
that part of Dutcher v. Hill, from the fact that we do
not find the record shows such appearance and admis-
sion by the defendant in this case. The proceedings
to relieve defendant in this case and to discharge
Hughes as guardian were not instituted by defendant,
or at his instigation. Nor does it appear that he was
served with notice, though the record shows his pres-
ence in the court room, but not as a participant in the
proceedings. His name appears in the way of recita-
tion that he and eight other persons were in court as
witnesses. The most that we can make out of the
wording of the record is that he was a witness; and it
is recited that the court "after seeing and talking
with" him and hearing witnesses, concluded he could
manage his own affairs. We do not think such a rec-
ord shows a recognition of the original proceedings, or
that it amounts to a solemn admission that they were
valid.

But plaintiff insists that granting there was no
valid adjudication of insanity and that the appoint-
ment of a guardian was void, defendant is yet liable
for the account on the ground that it was for necessa-
ries furnished for himself and his family; and, in fact,
plaintiff's petition is based on the ground that it was
necessaries which were furnished the guardian.

There being no legal guardian and the proceeding
of the probate court being void from the beginning,
and plaintiff's petition being confined to necessaries

for the defendant, and for his family while he was insane, has made inapplicable much of the authority cited by him. From these we gather that the probate court handling a ward's estate through his guardian, is not tied with legal restraint to the extent that it is when supervising and directing an administrator. It seems the court, if the estate will justify it, may authorize to be done what it is convinced the insane person would have done had he been in his right mind. Thus allowances, in certain circumstances, may be made for support of a bastard child, for collateral kin, for uncles and aunts, for usual contribution to the church; In the Matter of Willoughby, 11 Paige, 257; In the Matter of Heeny, 2 Barb. Ch. 326. In Ex parte Whitbread, 2 Mer. 99, Lord ELDON stated that, ''where the father of a family becomes a lunatic, the court does not look at the mere legal demands which his wife and children may have upon him. . . . The court does nothing wantonly or unnecessarily to alter the lunatic's property, but on the contrary takes care, for his sake, that, if he recovers, he shall find his estate as nearly as possible in the same condition as he left it, applying the property in the meantime in such manner as the court thinks it would have been wise and prudent in the lunatic himself to apply it, in case he had been capable.

''The difficulty I have had was as to the extent of relationship to which an allowance ought to be granted. I have found instances in which the court has, in its allowances to the relations of the lunatic, gone to a further distance than grandchildren—to brothers and other collateral kindred; and if we get to the principle, we find that it is not because the parties are next of kin of the lunatic, or, as such, have any right to an allowance, but because the court will not refuse to do, for the benefit of the lunatic, that which it is probable the lunatic himself would have done.'' While In re Darling, 39 Ch. D. 208, approves that case,

it is said that it is not the duty of the court to deal benevolently or charitably with the property of the lunatic and that applications for allowances out of the surplus income of his estate to poor relatives who have no legal claim should be discouraged. And that while the court will do what it is convinced the lunatic himself would have done if sane, yet in making allowances to collateral kindred, it should act "with the utmost jealousy;" that is, with much more circumspection than when dealing with the case of direct heirs, who, it seems, may be required, in certain contingencies, to give receipts as for sums in the nature of advancements.

But the foregoing cases concern legal guardians duly appointed by the probate court and who have acted by the direction of the probate court. While in this case we have no valid appointment of guardian and no action of a court with jurisdiction. In those cases there was action by courts intrusted by law with the duty to investigate and with a discretion to authorize expenditures beyond mere necessaries. What difference should this make in the rights of the parties where the question concerns necessaries?

In Gilfillens Estate, 170 Pa. St. 185, the grandfather of an infant, deaf, mute child, conceived himself to be her guardian, though he was never appointed. He expended her whole estate for her education through her sense of sight, and succeeded in giving her great relief against her sore affliction and making her contented in a plight which otherwise would have left her without happiness. The self-constituted guardian died and an effort was made to have his estate account for the money he had used. The case was taken to the Supreme Court of Pennsylvania, where it was held to be manifest that the expenditure in the behalf it was made would have been entirely proper and would, without doubt, have been sanctioned by the proper court; if a legal guardian had presented his application to

such court for permission to so expend it. And that no different rule ought to be applied to a case where there was no appointment of guardian, if one had acted as such in point of fact, and had faithfully discharged his trust. In Newberg v. Bickerstaffe, 1 Vern. 296, it was said that "if a man intrudes himself upon an infant, he shall receive the profits, but as guardian; and the infant shall have an account against him, as against a guardian." To the same effect, see Davis v. Harkness, 6 Ill. 173, 4 Paige, 64.

Applying the foregoing law to the instance of a guardian of an insane person (and we discover no distinction) we can see where defendant could have demanded an accounting of Hughes, and that the latter could have brought in, as credits, all proper expenditures which he may have made for the preservation of the estate and for necessaries for the family. That being true, it would follow that if the balance were in favor of the guardian he would be allowed a judgment for such sum.

Now assuming that this action is properly brought against defendant as the restored insane person, instead of Hughes the self-constituted guardian, we will proceed to inquire whether the four items conceded as making up the account as necessaries. First is the item of $195.40, paid to James Shanklin, a son and a man of family over thirty years of age, who was moving to California and the money was for tickets, clothing, etc. It seems that James owned a piece of property which the guardian bought of him and then sold. And the payment to James when he started West was on that account. It is so involved, or at least is so indefinitely explained that we find it difficult to understand. But, however, it may be, it is incomprehensible how it could be considered "necessaries" for defendant's family.

The next item is for $1714.47; this was for premiums for keeping up life insurance which had been

taken out in different companies and insurance orders by defendant while sane, and we think it should be allowed. It can be very well denominated a necessary in the circumstances of defendant's insanity and the complicated and uncertain condition of his estate. It was paid by Hughes in good faith and for a proper and necessary purpose.

The next item is $2585.25 for Ida Shanklin and includes items of expense incurred during a protracted sickness and at her death. But she was past her majority, perhaps twenty-five years of age, and had been from home earning her own living for several years. Many of the items doubtless would have been necessaries as against her and her estate, but not so as against her insane father's estate. The act of Hughes in making these payments was not in discharge of any obligation owing by defendant. In Rodgers on Domestic Relations, sec. 494, it is said that in the absence of an agreement, "it is the rule, therefore, that when the child arrives at the age of twenty-one years or other age fixed by law, when the majority is attained the duty of the parent to support, whether the child be male or female, is at an end. The poverty or wealth of the child does not, in any sense, alter the rule. The duty of support by the parent ceases absolutely upon the arrival of the child at majority. So a parent is not liable to a third person who furnishes necessary medical attention to his adult child in sickness, and this is true though the child be sick at the house of the parent at the time and be actually living with his father as a member of his family. Nor is the father liable for clothing actually necessary, where furnished after the majority of the child." To the same effect is Brower v. Supreme Lodge, 87 Mo. App. 614; 2 Kents Com. 191, 192; Blachley v. Laba, 63 Iowa, 22. The authorities cited by plaintiff do not controvert these propositions; they are not applicable to the evidence here which shows the age, occupations and resi-

dences of the persons to whom it is claimed necessaries were furnished. The next item is $1006.37 charged in gross for interest on the various sums advanced to Hughes through a series of years. No sufficient showing was made by the evidence to justify an allowance of that amount. But we understand the only interest insisted upon now, is upon these items of account we have discussed, since the institution of this action, and as that could only be allowed on valid claims, there would be no interest under our conclusions, except on the insurance item, and as that would make no difference in the result at which we have arrived, it need not be calculated.

By reference to our statement of the account at the outset, it will be seen that by disallowing as charges the three foregoing items aggregating $3787.02, we reduce the debtor side of plaintiff's whole account to $5427.22, and as this is less than the credit entered by plaintiff, of course there is nothing owing to it.

The judgment is affirmed. All concur.