Joseph B. Williams, Respondent, v. Jennie Vaughan, Appellant.
First National Bank of Carrollton, a Corporation, Respondent,
v. Jennie Vaughan, Appellant, Nos. 43234 and 43252—253 S.W.
(2d) 111.

Court en Banc, November 10, 1952.
Rehearing Denied, December 8, 1952.

*Chas. L. Graham* and *Christian F. Stipp* for appellant.

*John Franken* and *D. D. Thomas, Jr.*, for respondents.

*Daniel S. Millman* for the First National Bank of Kansas City, Guardian and Curator of the Estate of Virginia Eleanor Flanagan, a Person of Unsound Mind, amicus curiae.

642

644

TIPTON, J.—The Kansas City Court of Appeals reversed the judgments of the circuit court of Carroll County in the above entitled cases. The opinions of that court are reported at 248 S.W. 2d 677 and 248 S.W. 2d 685. This court ordered that they be transferred here for our review. For the purpose of argument and an opinion they were ordered consolidated.

Both cases grew out of the following facts:

Dr. Richard F. Cook, a resident of Carrollton, Missouri, was found to be a person of unsound mind by the probate court of Carroll County on October 18, 1948. Wade W. Maupin, an attorney of Carrollton, was duly appointed guardian of the person and estate of Dr. Cook on the same date. He qualified and filed an inventory of his ward's estate on December 6, 1948, which showed real estate of the value of $6,010 and personal property of the value of $3,848.07. The personal

646

property consisted of $2,623.60 on deposit in the First National Bank of Carrollton, $4.47 found on the person of Dr. Cook, the remainder consisting of an automobile, household and office furniture and supplies, and 20 shares of Houston Oil Fields Co.

Prior to and at the time of the adjudication, Dr. Cook was in St. Luke's Hospital in Kansas City and his hospital, nursing and medical expenses alone exceeded $50 a day. A great number of bills had been incurred by Dr. Cook for his support, care and treatment prior to the date of the appointment of his guardian. Immediately after his appointment the guardian proceeded to pay the same. Due to Dr. Cook's illness the heavy expenses increased rapidly and the guardian became apprehensive about there being sufficient funds for his ward's care and maintenance, and on December 15, 1948, applied for and obtained an order of the probate court to sell the real estate. About this time Dr. Cook was transferred to the state hospital at Farmington, Missouri, where his care and maintenance would be less expensive. In the meantime, it was necessary for the guardian to obtain immediate funds to pay bills already incurred for the maintenance and care of his ward and on December 22, 1948, he orally applied to the probate court for and obtained an order authorizing him to borrow $1,500 to pay the bills accrued and for the future support and maintenance of his ward. The order to sell the real estate was never carried out because of Dr. Cook's death eleven days thereafter.

The guardian then went to Kansas City and wrote checks to pay his ward's hospital and nurses bills and the ambulance bill for taking Dr. Cook to the state hospital at Farmington. He also paid a small mortgage on his ward's real estate. The guardian then went to the president of the First National Bank of Carrollton and executed a note, signed by him as guardian of Dr. Cook, for $1,500, so that the checks he had written would be honored by the respondent bank.

On December 26, 1948, Dr. Cook died. Wade W. Maupin was appointed administrator of his estate on December 31, 1948. He made his final settlement as [113] guardian on January 18, 1949, which was approved by the probate court. He was thereupon discharged as shown by his inventory and appraisement. He turned over to himself as administrator the balance of the unexpended funds of his ward which amounted to $68.39, and the property he inventoried as guardian.

The payment of the money borrowed from the First National Bank of Carrollton is contested by the appellant, Jennie Vaughan, who is a sister of the deceased Dr. Cook and his only heir.

In the case of Williams v. Vaughan, No. 43,234, the facts in regard to Dr. Cook's being adjudged a person of unsound mind, the appointment of a guardian, et cetera, are the same as in the case of First National Bank of Carrollton v. Vaughan, No. 43,252.

Respondent Williams was a nephew of Dr. Cook's wife and spent a great deal of his time as a youth in the Cook home. Dr. Cook's wife died before he became insane. Apparently Dr. Cook was insane some time before he was adjudged so. Maupin wrote this respondent about Dr. Cook's condition and respondent sent Maupin $100 which was deposited to Dr. Cook's account in the bank. The evidence shows that this sum was used for Dr. Cook's support and maintenance after he was adjudged to be insane. Later respondent sent Maupin $400. He stated that the $100 and $400 were to be considered as an emergency advancement and loan, and that the same should be returned as soon as the property of the estate was converted into cash and made available for the use of the ward. As evidence of this agreement, the guardian executed a note in favor of respondent for $500.

The evidence in both of these cases clearly shows that all the money advanced or lent the guardian was used solely for the support and maintenance of his ward except a small amount that was used to pay a small note secured by a deed of trust on the real estate so that it might be sold to a better advantage.

Wade W. Maupin was appointed the guardian of the person of Dr. Cook and curator of his estate. As guardian it was his duty to take charge of his ward and to arrange for a suitable home, food, clothing and other necessaries, the reasonable value of which is a proper charge against the ward's estate. The curator is charged with the care and management of the ward's estate, subject to the superintending control of the probate court. It is his duty to collect the assets and to make proper investments thereof, and otherwise manage the estate. Whether the charge against the estate for necessaries furnished is reasonable is, under all circumstances, a question to be finally determined by the probate court. St. Vincent's Sanitarium v. Murphy, Mo. App., 209 S. W. 2d 560.

In the case at bar, the hospital, nurses and medical care at Kansas City and the charges for ambulance transportation of Dr. Cook from Kansas City to Farmington were proper charges against his estate if, in the opinion of the probate court, these charges were reasonable. Since the final settlement of Maupin as guardian was approved by the probate court, these charges were reasonable. This question is not subject to collateral attack. "Probate courts are courts of record, and their judgments and orders must be respected." McKay v. Snider, 354 Mo. 674, 190 S.W. 2d 886, l. c. 891. For the same reason, the propriety of paying the note secured by a deed of trust on the real estate is not subject to collateral attack.

We do not understand that the appellant contends that the above enumerated items are not proper charges against the estate but that her main contention is that the loans made by respondent First National Bank of Carrollton and respondent Williams are illegal be-

cause under the statute the only way for a guardian to borrow money is to mortgage the available real estate belonging to the ward. Chapter 458, RSMo 1949, does authorize a guardian to mortgage his ward's real estate under certain conditions. However, there is nothing in this chapter that prohibits a guardian from borrowing [114] money needed for the ward's support and maintenance without giving a mortgage on the ward's real estate.

In the case of St. Vincent's Sanitarium v. Murphy, supra, 209 S.W. 2d, l. c. 565, the St. Louis Court of Appeals said:

"Unless there is a statute to the contrary, the corpus of the personal estate may be intrenched upon to the extent that it may be necessary to the maintenance of the ward, without first obtaining permission from the court. Bliss v. Spencer, 125 Va. 36, 99 S.E. 593, 5 A.L.R. 619; Cross v. Rubey, Mo.App., 206 S.W. 413; Potter v. Berry, 56 N.J.L. 454, 28 A. 668; affirmed 57 N.J.L. 201, 33 A. 455; Lake v. Hope, 116 Va. 687, 82 S.E. 738; 25 Am.Jur., Guardian and Ward, Sec. 71, p. 47; 44 C. J. Insane Persons, Sec. 89, p. 238; See Annotations, 5 A.L.R. 632. We have no statute in this state requiring an order of court in such instances."

For the purpose of these cases before us, we will assume that both loans in question were obtained without legal authority. However, the proceeds of these loans did pay lawful obligations owed by the estate of Dr. Cook, a person adjudged of unsound mind. As we have already pointed out, the money obtained from these two respondents was used to pay for hospital, nursing and medical care and ambulance transportation, and to pay a mortgage on real estate owned by Dr. Cook. This ward's estate was legally liable for these items and the persons who were paid these obligations had a lawful claim against his estate. The question before us is: Can these respondents be subrogated to the claims of the persons who received the money advanced or loaned by the respondents?

In the case of Berry v. Stigall, 253 Mo. 690, l. c. 696-697,162 S.W. 126, 50 LRA, NS, 489, AnnCas 1915C 118, we said:

"That equity seeks to prevent the unearned enrichment of one at the expense of another is the motive for an important part of its jurisprudence. [2 Pomeroy's Equitable Remedies, sec. 920.] This same idea is expressed in the maxim of the common law: '*Nemo debet locupletari ex alterius incommodo,*' and more fully in the maxim of the civil law: '*Jure naturae aequum est, neminem cum alterius detrimento et injuria fieri locupletiorem.*' The principle is applied to aid those who have paid the debt of another under circumstances in which equity will imply a sufficient motive, whether such motive consists in the protection of an interest in the person invoking it, the performance of a duty pertaining to a fiduciary relation, or the invitation of the public, or of him whose debt is paid. While it does not extend its assistance

to a mere volunteer who either foolishly or for charity's sake pays the debt of another, it relieves those whom the learned author already cited has divided into the three following classes: 'First, those who act in performance of a legal duty, arising either by express agreement or by operation of law; second, those who act under the necessity of self-protection; third, those who act at the request of the debtor, directly or indirectly, or upon invitation of the public, and whose payments are favored by public policy.' [Ibid., sec. 921.] Judge Story in his work on Equity Jurisprudence, (vol. 1 [13 Ed.], p. 645), characterizes this principle as a doctrine belonging to an age of enlightened policy and refined, although natural, justice.''

In the case of McKay v. Snider, supra, 190 S.W. 2d l.c. 893, we held:

''In acting to refinance the indebtedness, the guardian and curator acted to protect the assets of the estate. The guardian and curator of the Lawrence estate in furnishing the funds for the payment of the debts of the Arnold estate was not a volunteer. Berry v. Stigall, supra; Netherton v. Farmers Exchange Bank, 228 Mo.App. 296, 63 S.W. 2d 156. The proceedings for refinancing failed, not because prohibited by statute or public policy, but because of irregularity, in that, the controlling [115] records of the Probate Court failed to show that any petition asking authority was filed or that any order to borrow the money and execute the deed of trust was entered of record. The Arnold estate still owns the real estate and the rights of no other parties have intervened.

''We do not understand that the granting of proper equitable relief in a proper case has ever been held to be the making of a new contract for the parties. While the $1,000 note and deed of trust has been cancelled, the Arnold estate has the fund which was obtained from the Lawrence estate and this fund ought justly to be repaid. The Arnold estate may not retain the fund and also the described real estate relieved of the lien of the deed of trust. The assets of the Arnold estate consist of the described real estate. Ordinarily, a court of equity will not create a lien upon real estate in favor of a party unless, from the nature of the transaction, rights have sprung up which ought to be held binding upon the specific property. 33 Am.Jur., Liens § 21, p. 430. In this case the fund advanced was used, as stated, to discharge a prior valid lien on the described real estate and to pay for property, which the probate court by its order and judgment deemed necessary for the proper maintenance of the ward and his family. Under the statutes the described real estate could be mortgaged or sold for the payment of these debts. In equity and good conscience the Lawrence estate may be subrogated to the rights of the creditors whose claims have been discharged and the relieved property may be impressed with a lien. Berry v. Stigall, supra. 'When a court of equity is rightfully

possessed of a case, it will not relinquish jurisdiction "short of doing complete justice."' Nodaway County v. Alumbaugh, 348 Mo. 354, 153 S.W. 2d 74, 77. We deem the judgment in favor of the Lawrence estate on the cross petition to be right and in accordance with established precedents."

The case of Capen v. Garrison, 193 Mo. 335, 92 S. W. 368, 5 LRA, NS, 838, was partially overruled in the case of Berry v. Stigall, supra; however, in the case of McKay v. Snider, supra, we quoted with approval the following language in the Capen case (193 Mo. 1. c. 349-350):

"The doctrine of equitable lien follows closely on that of subrogation. They both come under the maxim 'equality is equity,' and they are applied only in cases where the law fails to give relief and justice would suffer without them. But the doctrine of equitable lien has its prescribed boundaries as well as that of subrogation; it is not a limitless remedy to be applied according to the measure of the conscience of the particular chancellor, any more than, as an illustrious law-writer said, to the measure of his foot. *The right to an equitable lien arises when a party at the request of another advances him money to be applied and which is applied to the discharge of a legal obligation of that other, but when, owing to the disability of the person to whom the money is advanced, no valid contract is made for its repayment.* For example, if money is advanced to a minor to pay a debt which he has incurred for necessaries furnished him, no action at law lies to recover of the minor on a contract express or implied for the repayment of the money loaned, yet as the money was loaned to discharge a debt for which the minor was liable at law and it was used for that purpose a court of equity will charge a lien on the minor's property to repay the sum advanced." (Italics ours.)

On principle, we are unable to distinguish the above cited cases from the facts in this record. Therefore, we hold that these respondents are equitably entitled to be subrogated to the rights of the parties who had lawful claims against the [116] ward's estate to the extent that the monies advanced or loaned by respondents paid such claims.

We disagree with appellant that respondents' petitions are based on the two notes or expressed contracts. The petitions allege the fact that Dr. Cook was adjudged insane and that the money borrowed from each respondent was necessary for the support, maintenance, hospital and medical expense of the ward that had already accrued and would accrue in the future. The notes attached to these petitions were merely evidence of the fact that each respondent had advanced a specific sum of money to the guardian. The petitions sought allowance of respondents' claims against the estate in the hands of the guardian and administrator and prayed an adjudication that if the personal assets were insufficient the real estate of the deceased be sold to satisfy

such claims. In the First National Bank case the prayer further sought "such other and further orders, touching the premises, as it [court] shall deem meet and just; and for all proper relief." These petitions state facts that would bring them within the doctrine of unjust enrichment against the administrator of Dr. Cook's estate. McKay v. Snider, supra. Appellant Jennie Vaughan is the sole and only heir of Dr. Cook and to get a complete determination of the issues in these cases she was a proper party, (Sec. 507.030) though perhaps not a necessary party. Maupin, as guardian of Dr. Cook, was not a proper party because his duties as guardian ceased upon the death of his ward; however, the decrees were not against him as guardian but only as adminstrator. Therefore, the appellant was not prejudiced.

"If the guardian of an insane person may be sued in the circuit court for necessaries furnished the ward during guardianship then we see no good reason why after the death of the ward the administrator cannnot be sued in the circuit court the same as the guardian, as the guardian's duties end ipso facto with the death of the ward and the administrator then becomes the personal representative, and can be sued for the obligations of the deceased." Tock v. Tock, (Mo. App.) 120 S.W. 2d 169, l.c. 172.

We hold that upon the death of Dr. Cook this guardian was without further power except to settle his account and deliver the estate and effects of his ward to the ward's personal representative, in this case Wade W. Maupin, as administrator of the deceased's estate. As such, he has sole authority to represent the estate and, therefore, was a necessary and proper party to these actions. Evans v. York, 216 S.W. 2d 124. Of course, it would have been improper for these respondents to have made a demand against the guardian after the death of his ward.

Under the facts and issues in these cases, we think the decree of the circuit court in each case was proper; therefore, the decrees should be affirmed. It is so ordered. All concur.