E. W. BENNETT, Claimant-Respondent,

v.

Hamilton ADAMS, Administrator of the Estate of John W. Matlock, deceased, Defendant-Appellant.

No. 8079.

Springfield Court of Appeals.

Missouri.

Nov. 21, 1962.

William E. Seay, Salem, Missouri, for defendant-appellant.

L. Clark McNeill, Salem, Missouri, for claimant-respondent.

RUARK, Presiding Judge.

This is an appeal from a judgment founded on a claim which originated in the probate court against the estate of one John W. Matlock, deceased.

The claim is by E. W. Bennett. In substance the claim states that he was attorney for one *Jerome* Matlock (who, as it will appear, was the father of John Matlock whose estate is here involved); that Jerome requested of claimant that the proceeds of his estate and the estate of his wife *not* be turned over to John Matlock, but that the same "be handled as a trust fund and paid out to him (John) as needed for his living and other legitimate expenses"; that claimant suggested the appointment of a guardian for John, but the father, Jerome, objected; that Jerome died and shortly thereafter his wife followed him in death, and their estates were administered in probate court.

The claim further states that "due to the request of the said Jerome Matlock" no guardian was appointed, but the funds coming from said estates were handled for the benefit of John in a trust account, "and as said estate was converted into cash and used for the benefit of the said John W. Matlock, the same was deposited" for his benefit and checks were issued by the claimant; that the net estates handled amounted to $25,161.77, including real estate valued (according to appraisal in the estates of the parents) at $3,000; that from March 27, 1939, to death of John the claimant handled the funds as a trust fund, made loans, collected notes and interest, cashed bonds and reinvested, paid personal taxes and taxes on the farm, and paid out funds to John as they were needed for his living and the operation of his farm; that John had no authority to check on the account and "all disbursements were made on the check of the said E. W. Bennett as trustee"; that in addition to looking after the funds, claimant advised John on legal matters, and attended to all deposits, withdrawals and investments; that "due to the physical and mental condition of the said John W. Matlock * * * your petitioner conserved the funds as much as possible under the circumstances and has drawn over the 20 year period only the sum of $600 to apply on his services"; that the reasonable value of his services is $4,000, against which should be applied the sum of $600 so received.

What happened to this claim in probate court is not shown. It reached the circuit court and was tried to the court, which gave claimant, now respondent, judgment in the sum of $1900. From that judgment the administrator has appealed.

At the trial the claimant attempted to testify, but his testimony was severely curtailed due to objections based on the dead man's statute, which objections we think were, in the main, properly sustained. (See Birdsong v. Ladwig's Estate, Mo. App., 314 S.W.2d 471.)

These facts came into evidence: Jerome was the father of John Matlock. Jerome died about 1937 and his wife a few months later. Prior to his death Jerome told Bennett, his attorney, that John was not very

"strong-minded" and he told claimant to take charge of his estate and "put it in a trust fund and take care of it for Johnny." After closing of estates of Jerome and his wife (in which Bennett acted as attorney), "there was some $25,000 to $27,000 in that estate, including the real estate, the farm that they lived on; all of the estate, except the farm, was placed in a trust account, in my name as trustee for J. W. Matlock." John Matlock died in February, 1960, leaving cousins as his nearest relation.

Respondent called as a witness the cashier of the Bank of Salem, who identified a bank statement (not offered in evidence) reflecting cash transactions covering a period extending from 1939 to 1960. The cashier said there were 24 pages in this account. It reflected a total of approximately 450 checks (none identified or offered in evidence). The deposits and redeposits amounted to approximately $65,000. The cashier testified that Bennett made deposits at various times, drew checks, invested in bonds, made loans, and collected interest. On occasions Bennett conferred with the banker. At the time of John Matlock's death there was $541.95 left in the account, and the farm remained. E. J. Malone, a real estate man, testified he had listed and subsequently sold the Matlock farm. (This sale was obviously completed after the death of John.) He said that in the dealings about this transaction he conferred with Bennett a half dozen times. He stated, "I knew he took care of Johnny's business. Johnny told me to go see Mr. Bennett." He stated he knew that over the years Bennett took care of Johnny's business. That was approximately all the evidence relating to the respondent's services. A responsible and reputable attorney was then called as a witness and testified that the reasonable attorney's fee for handling funds to the extent of deposits of $60,000, writing checks, making loans,

and reinvesting, would be from $150 to $175 per year.

The administrator testified that the assets of the estate in the amount of $11,000 were derived from the sale of the farm.

■ At the outset, we are confronted with the question of whether the claimant has put himself in the wrong court. *If,* indeed, claimant was, as he describes it, a trustee, rather than a business agent and attorney, then we think recourse should be made to the trust instrument (if such exists) in order to determine what compensation is to be paid to the trustee; and if no compensation was therein fixed, then the trustee should go into a court of equity, submit his accounting, and request such court to fix his fees. (See Morrison v. Asher, Mo.App., 361 S.W.2d 844 and cases cited therein.) But there is nothing in the record to show whether a trust was created by Jerome's will, whether one was created by voluntary assent of John, whether claimant simply declared himself "trustee," or how the funds got into his hands. The question is not raised by the appellant, and since, as we have concluded, the case must be reversed and remanded for reasons hereinafter mentioned, we will pass that question and go to the points made in appellant's brief.

It is first contended that claimant's case must fail because the claim is based upon a contract with Jerome Matlock and there was no proof of such agreement. It is also contended that quantum meruit against John Matlock's estate was not pleaded.

■■ It is frequently stated that strict rules as to pleadings do not apply to claims in probate court; that all that is necessary is a statement sufficient to inform the administrator of the basis and extent of the claim; and that, once adjudged, will become res adjudicata.[1] This subject just recently has been reviewed by Judge Stone

1. Siegel v. Ellis, Mo., 288 S.W.2d 932 (4); In re Thomason's Estate, 346 Mo. 911, 144 S.W.2d 79(4); Whitworth v. Monahan's Estate, Mo.App., 111 S.W.2d 931(3).

in the accompanying, though not companion, case of Malone v. Estate of Matlock, Mo.App., 362 S.W.2d 95. We feel it is not necessary to recite all the authority or to further elaborate, except to suggest that, even though a claim contains language indicating an express contract, if it is also susceptible of interpretation as being based on an implied contract for quantum meruit, it is sufficient as a basis for recovery on quantum meruit.[2] We do not regard the allegations in reference to Jerome Matlock as being an attempt to recover under a contract with Jerome. In fact, the record shows Jerome's estate to have been closed long ago, and this claim is against the estate of John. We think claimant's assertions were matters of inducement and justification. In other words, he wanted to make clear the circumstances as to how he came to be in control of the affairs of a boy who was "not strong-minded," and to show that he was not an interloper but was carrying out what he conceived to have been the wishes of an old client. In so far as the claim against the John Matlock estate is concerned, these allegations carried no "meat." The remainder of the claim asserts performance of certain services to John Matlock and the reasonable value of those services. We rule against the appellant on this contention.

■ However, we consider as serious the contention that respondent failed to sustain the burden of proof on quantum meruit. There is no proof of any express or inferred contract in fact between claimant and John Matlock for the performance of the services. There is no proof that Matlock *requested* respondent to manage his money. There is no proof that he *accepted* such services under conditions which would create the presumption that claimant expected to be paid. We think the fact that, in regard to the real estate sale near the end

of his life, John Matlock referred the real estate man to claimant can hardly be taken as a ratification or acceptance of the alleged acts of claimant over the previous 20-year period. As a matter of fact, claimant's own evidence raises some question as to whether or not Matlock was mentally capable of assent. (See Evans v. York, Mo. App., 216 S.W.2d 124.)

■ Since claimant neither pleads nor proves any request or voluntary acceptance on the part of Matlock, we conclude that his theory of recovery, if any at all, must be on quasi contract, a contract implied in law. Long ago, Judge Nortoni, speaking in Weinsberg v. St. Louis Cordage Co., 135 Mo.App. 553, 116 S.W. 461, 1. c. 466, said: "* * * Much confusion has been introduced by loose expression touching implied contracts, and frequently the distinction which obtains, accurately speaking, between contracts implied by the law and contracts implied by or inferred from the facts is overlooked. * * *" The writer confesses himself still confused by the various declarations of the courts. We are inclined to believe that many quantum meruit actions which are said to have been upon contracts implied in law are, in reality, upon contracts which are established by inference drawn from the facts. But, if they are once established, there is no difference as to the legal effect of such contracts. (Bailey v. Interstate Airmotive, 358 Mo. 1121, 219 S.W.2d 333(5), 8 A.L.R.2d 710.)

■■ Generally it can be said that contracts implied (inferred?) in fact arise when a person performs services or furnishes goods at another's request and there is no express agreement to pay therefor, but the circumstances are such that a promise to pay the reasonable value thereof may be implied (inferred?) from the circumstances, situation, conduct, and nonrelationship of the parties.[3] Even though there has been

2. Murphy v. Pfeifer, Mo.App., 105 S.W.2d 39(2); Laughlin v. Boatmen's Nat. Bank of St. Louis, 354 Mo. 467, 189 S.W.2d 974, 978; See Stanley v. Whitlow, 181 Mo. App. 461, 168 S.W. 840.

3. 12 Am.Jur., § 5, p. 500; Weinsberg v. St. Louis Cordage Co., supra, 135 Mo. App. 553, 116 S.W. 461, 466; Christianson v. McDermott's Estate, 123 Mo.App. 448, 100 S.W. 63, 64; Liebaart v. Hoehle's

no request, when valuable services or goods are knowingly *accepted* by the party benefiting therefrom under circumstances which would reasonably justify the belief that the party furnishing them expected payment to the extent of their reasonable value, the obligation to pay will be inferred or, as is often stated, implied by law.[4]

■ Contracts really implied in law are those which are imposed, or created, without regard to promise or intention of the party to be bound. The assent rests solely in legal fiction, and the liability created thereunder rests simply in reason and justice.[5] This fictitious implication of agreement to pay the reasonable value arises (as one example) when services or things necessary to the recipient are furnished to an incompetent person.[6] The fictitious contract is based primarily upon a benefit conferred upon the recipient of the goods or services. Running through all the cases which involve quantum meruit by reason of contract implied in law are the words "valuable" and "beneficial" services.[7] And where the benefit is clear, the liability for quantum meruit may arise even though the goods or services are requested by another than the recipient. (See Bailey v. Interstate Airmotive, supra, 358 Mo. 1121, 219 S.W.2d 333.)

■ But what benefit reached John Matlock? *The record does not show.* The nearest we can get to it is the statement by the witness Malone that he knew "that Mr. Bennett over the period of years took care of Johnny Matlock's business," but we think that is not enough. It should be shown that such services were of value or benefit to John W. Matlock. True, an account was established, investments were made, checks were written, but to whom?, and for what purpose? True, the account was depleted, but to what end? Who got the benefit of such money? By these questions we do not mean to imply that claimant did not serve his client long and faithfully and with scrupulous adherence to the finest traditions of his profession; but he did not prove it. No doubt he was caught short and unprepared in his proof because of the application of the dead man's statute; but we cannot establish a precedent whereby the right to recover in quantum meruit is given simply by the taking over money which belongs to another man and managing it, absent either (a) proof of request of the party to be charged (or acceptance of such management) under such circumstances as would require the inference or raise the presumption that payment was to be expected; or (b) proof that the services so rendered were valuable and of ben-

Estate, Mo.App., 111 S.W.2d 925, 929; Songer v. Brittain, Mo.App., 272 S.W. 2d 16, 20; Muench v. South Side Nat. Bank, Mo., 251 S.W.2d 1; Keeshan v. Embassy Inv. Co., Mo.App., 303 S.W.2d 666, 670; Leggett v. Mutual Commerce Cas. Co., Mo., 250 S.W.2d 995.

4. Kolb v. Howard Corp., Mo.App., 219 S.W.2d 856; Mecartney v. Guardian Trust Co., 274 Mo. 224, 202 S.W. 1131; Keeshan v. Embassy Inv. Co., supra, Mo. App., 303 S.W.2d 666, 670; Minor v. Lillard, Mo., 289 S.W.2d 1; Abresch v. Schultz, Mo.App., 216 S.W.2d 134, 139; Tomasso v. Sorbets, Mo.App., 147 S.W. 2d 151; Strother v. DeWitt, 98 Mo.App. 293, 71 S.W. 1129; Runnels v. Allen's Adm'r., Mo.App., 169 S.W.2d 73, 77.

5. 17 C.J.S. Contracts § 6, pp. 322 et seq.; 12 Am.Jur., § 6, p. 502; Christianson v. McDermott's Estate, supra, 123 Mo.App.

448, 100 S.W. 63; Patrick v. Crank, Mo.App., 110 S.W.2d 381, 384; Weinsberg v. St. Louis Cordage Co., supra, 135 Mo.App. 553, 116 S.W. 461; Lillard v. Wilson, 178 Mo. 145, 77 S.W. 74; Donovan v. Kansas City, 352 Mo. 430, 175 S.W.2d 874(17), 179 S.W.2d 108; See Baker v. Brown's Estate, 365 Mo. 1159, 294 S.W.2d 22.

6. 44 C.J.S. Insane Persons § 89, p. 239; Trask v. Davis, Mo.App., 297 S.W.2d 792; Hartley v. Hartley's Estate, 173 Mo.App. 18, 155 S.W. 1099.

7. To illustrate see: Poage v. Parker, Mo. App., 343 S.W.2d 203; Keeshan v. Embassy Inv. Co., supra, Mo.App., 303 S.W. 2d 666; Kolb v. Howard Corp., supra, Mo.App., 219 S.W.2d 856, 858; Strother v. DeWitt, supra, 98 Mo.App. 293, 71 S.W. 1129; Tessler v. Duzer, Mo.App., 309 S.W.2d 1.

fit to the person receiving them. With nothing proved in any of these respects, a claimant could be a mere interloper, taking over another's money and using it for his own benefit or the benefit of some party not entitled thereto, yet still claiming compensation therefor.

We believe, however, that there is a strong possibility that claimant-respondent may, on retrial, be able to produce the evidence necessary to substantiate his claim, and, therefore, the judgment should not be reversed outright, but should be reversed and the case remanded for a new trial. It is so ordered.

STONE and McDOWELL, JJ., concur.