LaVerna DeWALD, Appellant,

v.

W. S. MORRIS, Successor Guardian of the
Estate of John J. DeWald, Incom-
petent, Respondent.

No. 24288.

Kansas City Court of Appeals.

Missouri.

Dec. 6, 1965.

Allan R. Browne, Ennis, Browne & Martin, Kansas City, for appellant.

Edmund B. Smith, Meyer, Smith & Penner, Kansas City, for respondent.

HOWARD, Judge.

This is a proceeding on a claim for services rendered to the dependent mother and stepfather of an incompetent for $5,000.00 computed at the rate of $50.00 per week, against the estate of the incompetent. The claim was disallowed by the probate court and on appeal the circuit court sustained a motion for directed verdict at the close of plaintiff's evidence. We shall refer to the claimant LaVerna DeWald as plaintiff and to W. S. Morris, guardian of the Estate of John J. DeWald, as defendant.

The incompetent John Joseph DeWald has been under guardianship at least since 1921. More than fifty years ago Mrs. DeWald, mother of the incompetent, remarried. Her name since such remarriage was Jennie Bledsoe. Her husband was Richard Bledsoe. Mr. Bledsoe, after his marriage to Jennie Bledsoe, helped raise the incompetent as his son. For many years Jennie Bledsoe had been the guardian of the incompetent and had also been considered a dependent of her incompetent son, John DeWald. For at least the last several years the probate court had made an allowance of $180.00 per month from the Estate of John J. DeWald for the support and maintenance of Jennie Bledsoe. In 1961 Mr. and Mrs. Bledsoe were both 87 years old, feeble and in failing health. Their care was a problem and when members of the family asked the

advice of the attorney for the estate of John J. DeWald (who seemed to be well known to the entire family), it was suggested that they should be put in a nursing home. This would cost $175.00 per month each. When Mrs. Bledsoe was advised of the plan to put her in a home, she fell to her knees crying and begged and pleaded not to be sent to a home. Mr. Bledsoe flatly refused saying: "This is my home. I will die here." After discussion among the family and with Mr. and Mrs. Bledsoe, LaVerna DeWald stated that she would take care of them; that she and her husband would move in with Mr. and Mrs. Bledsoe. Mrs. Bledsoe promised to give her home to LaVerna and her husband in payment for such care.

LaVerna DeWald had been married to Frank DeWald, Jr. for about two months at this time. Frank DeWald, Jr. was the grandson of Jennie Bledsoe and the nephew of John J. DeWald, the incompetent. Frank had lived with his grandmother and taken care of her and Mr. Bledsoe for many years up until the time of his marriage, at age 35, when he moved out of the Bledsoe house and set up housekeeping with his wife.

LaVerna DeWald and Frank did move in with Mr. and Mrs. Bledsoe on September 29, 1961, and LaVerna took care of both Mr. and Mrs. Bledsoe on a 24 hour, 7 day a week basis, until Mr. Bledsoe died February 27, 1962, and continued to take care of Mrs. Bledsoe until she went to the hospital early in December of 1962. Mrs. Bledsoe died December 12, 1962.

It appears that LaVerna did all the washing, ironing, cooking and housekeeping, as well as nursing both patients and cleaning up after them when they no longer had control of their bodily functions. The evidence shows that all this work was done in an excellent manner, and that she kept the house and both patients in a spotlessly clean condition. When they moved in with the Bledsoes, LaVerna and Frank redecorated the house, with the consent of the attorney for the incompetent's estate, who purchased

a new stove for the house, at least inferentially out of the funds of the estate. Frank DeWald testified: " * * * Mr. Smith was nice enough to let us go ahead and redecorate it, bought a new stove."

As previously stated, Mrs. Bledsoe had promised to will her home to LaVerna and Frank DeWald in payment for the care given to Mr. and Mrs. Bledsoe. However, Frank DeWald testified that when Mr. Bledsoe died, " * * * the house was signed over to the Veterans Administration or estate, I guess it was, for my grandfather's funeral expenses". After the house was gone, Mrs. Bledsoe repeatedly promised LaVerna that she would be paid, and well paid, for her work by the estate of her son John J. DeWald, the incompetent. It was testified that Mrs. Bledsoe stated that she never had any trouble getting anything she wanted from the estate, including cars and everything else, and that she was dependent upon her incompetent son and was supported by his estate.

During all the time up to her death, Mrs. Bledsoe was mentally alert, although physically ill and feeble. She was the guardian of her incompetent son, John J. DeWald, and it appears that, in addition to the regular allowance for support made to Mrs. Bledsoe from his estate, the estate also paid for medicine for Mrs. Bledsoe when billed by the drug store which filled her prescriptions. Likewise, after the house was signed over to the estate on the death of Mr. Bledsoe the estate paid the rent on an apartment occupied by Mrs. Bledsoe until she entered the hospital on her terminal illness.

At the close of plaintiff's evidence, a motion for directed verdict was filed by the defendant on the basis of insufficiency of the evidence. This motion was sustained by the trial court and verdict and judgment for the defendant followed. On this appeal plaintiff contends that the trial court erred in directing a verdict for defendant because the evidence adduced by plaintiff was sufficient to make a case for the jury and also that the trial court erred when it excluded evidence concerning the value or financial status of the estate of John J. DeWald.

The brief filed in this court by defendant makes only one point and that is that this matter is governed by the provisions of the Uniform Veterans' Guardianship Law and particularly Section 475.445 RSMo 1959 and V.A.M.S. (all statutory citations are to RSMo 1959 and V.A.M.S. unless otherwise noted). Although several witnesses testified that John J. DeWald was now, and for many years had been, a patient in various Veterans Administration hospitals or facilities, there was no other evidence before the court which would bring this proceeding within the provisions of the Uniform Veterans' Guardianship Law. Section 475.445 supra provides that a guardian shall not "apply any portion of the income or the estate" of a veteran whose estate is subject to the Uniform Veterans' Guardianship Law for the support or maintenance of any person other than the ward, or his spouse and minor children, except upon prior order of the Probate Court after a hearing. Notice of such petition and hearing are required to be given to the Veterans Administration. The important words in the above provision are "income" and "estate". Section 475.480 RSMo 1959 is likewise a part of the Uniform Veterans' Guardianship Law. It provides that the uniform law shall apply "to all income and estate" of a veteran whether the guardian was appointed under the Uniform Veterans' Guardianship Law or under any other provisions of law. The words "income" and "estate" are not used in these statutes in their general sense, but in a special and restrictive sense, as set out in Section 475.-380 RSMo 1959, which gives special definitions to such terms. Said section provides: "As used in sections 475.380 to 475.-480: * * * (3) 'Income' means moneys received from the Veterans Administration and revenue or profit from any property wholly or partially acquired therewith; (4) 'Estate' means income on hand and assets acquired partially or wholly with income; * * *." Thus, it is only when we are

dealing with moneys received from the Veterans Administration or property, or income from property, acquired with such benefits received from the Veterans Administration that the Uniform Veterans' Guardianship Law, and particularly Section 475.-445 relied on by defendant, applies. In this case there is absolutely no evidence showing that these provisions are applicable to these proceedings. Even if we were to assume or infer (which we do not) from the mere fact that the incompetent John J. De-Wald is and long has been a patient in a Veterans' Administration hospital, that the estate has income, or assets derived from income, from the Veterans' Administration, there is no showing that the estate does not have either income or assets, or both, derived from sources other than the Veterans' Administration. It is also significant that the Veterans' Administration, although it has a right so to do, is not appearing and contesting the allowance of this claim. See McKay v. Snider, 354 Mo. 674, 190 S.W.2d 886.

The only authority cited by defendant in support of his contention that the Uniform Veterans' Guardianship Law is applicable to the present proceeding is the case of In re Hoerman's Estate, Mo., 247 S.W.2d 762. This case is not in point. It involved a mother who was guardian of her incompetent veteran son. For thirty years she had received checks from the Veterans' Administration made payable to her as guardian, which constituted disability payments under Government War Risk insurance. She cashed these checks as received and used the money herself instead of putting the money into the estate of her incompetent son. During part of this time, an allowance was made out of the estate for her support and when it was discovered that she was using part of such allowance to help support her other adult children, such allowance was reduced. When the conversion of the checks was discovered, the mother was removed as guardian. At the time of her final settlement she secured an order from the probate court making an additional monthly allowance to her, for her support and maintenance for the past thirty years, to cover the checks which she had cashed and used. On exceptions to her final settlement, the court held that the order retroactively making an allowance to the mother was not supported by the evidence, because during at least seven years of this time, she was not dependent upon the estate, but was supported by her husband, who himself died leaving considerable estate. Also the evidence showed that during other portions of the time covered, the allowances made out of the incompetent's estate were more than adequate for her support and no additional allowance therefor was justified. Thus the court held that the order was void. The court also pointed out that the real purpose of this retroactive allowance was to cover the conversions by the mother and for that reason such order was invalid. The court did discuss what is now Section 475.445, but its decision is not based thereon.

■ Furthermore, even if we were to find that Section 475.445 was applicable to this proceeding, such statute would neither justify nor require the directed verdict entered in this case. No money from the estate has as yet been "applied" for the support of Mr. or Mrs. Bledsoe. The present proceeding is an application to the court to have money from the estate applied for such support and the hearing on this claim and its determination would comply with the statutory requirement for hearing and prior order. Giving notice of this claim and the hearing thereon to the Veterans Administration would comply with the notice requirements of this statute and the court could then proceed to make an allowance in the proper amount. The transcript in this case does not reveal whether or not such notice was given. Since this case must be retried as pointed out hereinafter, any deficiency in notice can be supplied if claimant deems it advisable.

Thus we are relegated to the provisions of Section 475.125 and any other applicable provisions of the general law on guardian-

ships and incompetents for a determination of the issues here presented. Section 475.125 authorizes the probate court to make orders "for the maintenance of his (the insane ward's) family * * * according to his means". It has been specifically held in the case of State ex rel. Kemp v. Arnold, 234 Mo.App. 154, 113 S.W.2d 143, that a mother who is in fact dependent upon her incompetent son comes within the meaning of the word "family" as used in this statute, and that therefore the probate court does have jurisdiction to entertain a petition to authorize the expenditure of funds from the incompetent's estate for the support and maintenance of the mother. The court held that the probate court had jurisdiction to "authorize such an allowance to be made where there is sufficient evidence adduced at the hearing on the application to satisfy the court that the incompetent, if he were sane, would himself make the contribution." See also Citizens' State Bank of Trenton v. Shanklin, 174 Mo.App. 639, 161 S.W. 341, where this court pointed out that expenditures from a guardianship estate were proper where the court was convinced that the incompetent would make such expenditures if he were competent and able to manage his own affairs. The court said: "It seems the court, if the estate will justify it, may authorize to be done what it is convinced the insane person would have done had he been in his right mind."

■ In the present case the evidence shows that Jennie Bledsoe was in fact, and long had been considered by the probate court to be a dependent of her incompetent son John J. DeWald. Both Mr. and Mrs. Bledsoe were in need of care and plaintiff rendered long and faithful service in providing such necessary care. There was no blood relationship between LaVerna DeWald and either Mr. or Mrs. Bledsoe, thus the law will not imply an intent to render gratuitous services but on the contrary, without evidence requiring a different conclusion, these facts alone would be sufficient to show that the services were neither intended to be nor expected to be gratuitous.

See Poppa v. Poppa, Mo.App., 364 S.W.2d 52, where an implied contract to pay for farm services was found to exist between brothers, and Boyher v. Gearhart's Estate, Mo.App., 367 S.W.2d 1, where the court found an implied contract in the case of a niece caring for her uncle, who was aged and ill. See also Ramsey v. Hicks, 53 Mo. App. 190.

Bennett v. Adams, Mo.App., 362 S.W.2d 277, cited and relied on by the probate court in denying this claim turned on the failure of proof occasioned by the claimants' inability to testify because of the dead man's statute. It is not applicable here where there was ample testimony as to the quality and quantity of LaVerna's services. The evidence here shows that Mrs. Bledsoe did not expect that LaVerna DeWald would render such care gratuitously, but expected to pay for such services; she promised to give her house to LaVerna and her husband in payment, and made a will to carry out such promise. When such will became ineffective, because Mrs. Bledsoe signed over the house to the incompetent's estate to cover Mr. Bledsoe's funeral expense, Mrs. Bledsoe then repeatedly promised LaVerna that she would be paid from her incompetent son's estate, which estate had supported Mrs. Bledsoe for many years.

■ Thus we have necessary and valuable services rendered to Mrs. Bledsoe, under circumstances where it is clear that there was no intention to render the services gratuitously, and where Mrs. Bledsoe expected to pay for such services. The evidence is sufficient to make a case for the jury and the trial court erred in directing a verdict for defendant.

■ No order of the probate court was secured prior to the rendering of such services authorizing the estate to pay therefor. However, such prior order is not necessary. Mrs. Bledsoe, as guardian, could have paid for such services out of the moneys of the estate. If she had done so, she would have taken the risk that when

credit was claimed for such payment in her settlement, the court might disallow part or all thereof. However, the absence of such a prior order does not militate against the propriety of paying for the services. See the early cases of Guion v. Guion's Admr., 16 Mo. 48 and Brent v. Grace's Admr., 30 Mo. 253, where it is said, 1. c. 256:

. "The guardian may, if he chooses, apply in the first instance for an order and appropriations; but if he does not, and takes the risk of having his accounts disallowed when he makes his settlements, that is his own concern, and his omission to do so is no fraud upon his award. The court, in either case, determines whether the expenditures are necessary and proper; and allowing accounts for expenditures already incurred is, in effect, the same as making a formal order for appropriations beforehand, and equally satisfies the statute".

This holding has repeatedly been adhered to down through the years. See State, to Use of Smith v. Martin, 18 Mo.App. 468; Fitzsimmons v. Fitzsimmons, 81 Mo.App. 605; In re Lissner's Estate, 233 Mo.App. 1121, 129 S.W.2d 1067; Cross v. Rubey, Mo.App., 206 S.W. 413; St. Vincent's Sanitarium v. Murphy, Mo.App., 209 S.W.2d 560; Williams v. Vaughan, 363 Mo. 639, 253 S.W.2d 111.

■ As a matter of fact we do not have a case of the guardian making payment and then asking for approval by the court. No payment has been made. This is an action by one who has provided necessary services to secure payment for such services by filing a claim against the estate. In such circumstances, no prior order is required. Where the services are necessary, as they were in this case, recovery on such claim can properly be had. In St. Vincent's Sanitarium v. Murphy, supra, the services were rendered to the incompetent, here they were rendered to the dependent mother of the incompetent. In both instances such services were necessary and valuable. In both instances our statutes authorize use of funds of the incompetent's estate for such purposes on a proper showing. The court approved recovery in the St. Vincent's case supra and plaintiff in the present case should recover. The amount of such recovery is to be determined by the trier of facts and it may be well to set out here, as said in Boyher v. Gearhart's Estate, Mo. App., 367 S.W.2d 1, that there is no need for evidence as to the value of nursing and domestic services, as the triers of fact, from their general knowledge, can themselves place a value thereon.

What we have said heretofore applies primarily to that part of the claim which is for services rendered to Mrs. Bledsoe. Claimant also nursed Mr. Bledsoe until his death on February 27, 1962. Since this case must be retried the court should be guided by the principles set forth herein and in State ex rel. Kemp v. Arnold, 234 Mo.App. 154, 113 S.W.2d 143, and Citizens' State Bank of Trenton v. Shanklin, 174 Mo.App. 639, 161 S.W. 341, in considering that part of the claim which is for services rendered to Mr. Bledsoe.

■ Point two of plaintiff's brief complains of the action of the court in excluding evidence showing the value or financial status of the incompetent's estate, and some past expenditures allowed out of the estate for the use of the mother, Mrs. Bledsoe. In view of the fact that a retrial of this case will be necessary, an extended discussion of this problem is not required. However, we do point out that Section 475.-125 provides for the maintenance of the family of an incompetent "according to his means". This refers to the "means" of the incompetent. Thus proper evidence as to the financial status of the estate which is to pay for the services in question should be admitted to assist the jury in arriving at a determination of the propriety and necessity of the services and the compensation to be awarded therefor. See Citizens' State Bank of Trenton v. Shanklin, 174 Mo.App.

639, 161 S.W. 341 and St. Vincent's Sanitarium v. Murphy, Mo.App., 209 S.W.2d 560 and cases therein cited.

Because of the error in granting a directed verdict for defendant, the judgment of the trial court is reversed and the cause remanded for new trial.

CROSS, P. J., and DOUGLAS W. GREEN, Special Judge, concur.

BLAIR, J., not participating.